PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
12/07/99
THOMAS  K. KAHN
CLERK

_____

No. 98-4781
_____

D. C. Docket No. 97-8109-CR-KLR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GEORGE R. HUNERLACH,

Defendant-Appellant.

------------------------------------------------
Appeal from the United States District Court
for the Southern District of Florida
------------------------------------------------

**(December 7, 1999)**

Before ANDERSON, Chief Judge, MARCUS, Circuit Judge, and MILLS[*], Senior District Judge.

RICHARD MILLS, Senior District Judge:

_____

[*]Honorable Richard Mills, Senior U.S. District Judge for the Central District of Illinois, sitting by designation.

Hunerlach appeals from his convictions and sentence which he received for willful evasion of payment of taxes (26 U.S.C. § 7201) and filing a false statement (26 U.S.C. § 7206(1)).

Mainly, he argues that his conviction for filing a false statement should be reversed because the prosecution was commenced beyond the six-year statute of limitations and the district court erroneously admitted evidence in violation of his constitutional rights. He also challenges his conviction for wilful evasion of payment of taxes arguing that there was insufficient evidence to sustain the conviction.

He further argues that the district court erroneously included interest and penalties as "tax loss" in calculating his sentence.

We affirm the convictions, but vacate and remand for re-sentencing.

## I. FACTS

On September 7, 1988, Hunerlach pleaded guilty to one count of a three-count indictment charging him with filing false tax returns for the years 1981 through 1983, a violation of 26 U.S.C. § 7206(1), and entered into a plea agreement with the government. In the plea agreement, Hunerlach agreed to pay the income tax liabilities arising from the false returns within a "reasonable time." He served a brief prison

time as a result of his conviction on that charge.[1]  Shortly after his release from prison, instead of paying the tax obligations, Hunerlach transferred most of his money to accounts in Barclays Bank in the Bahamas, which, by the time of trial in this case, contained over $200,000.00.  Hunerlach also started to purchase, sell, and/or mortgage various pieces of property, including real estate and private planes, through the use of nominee corporations named DTS,[2] Dagny,[3] Henry Reardon Inc., and Dobill.[4]

Meanwhile, the government attempted to collect on Hunerlach's tax liability. On November 23, 1989, Manual Junco, Hunerlach's Certified Public Accountant (CPA) and power of attorney, signed a Form 870 Waiver of Restrictions on assessment and Collection of Deficiency and agreed to the assessment and collection of past due taxes in the amount of $306,020 for 1981 through 1983, penalties and additions to the tax in the approximate amount of $228,623, and interest. Approximately a year later, Hunerlach and his wife signed a notice-of-deficiency waiver, and agreed to the determination by the IRS of income tax deficiencies and penalties for taxable years 1984, and 1986 through 1988 in the amount of $69,891,

---

[1]As of the date of the indictment in this case, Hunerlach's obligation remained unpaid.

[2]  Hunerlach represented DTS as a "Panama Corporation."

[3] Dagny was a purported Bahamian corporation.

[4] Dobill was a Delaware corporation.

penalties and additions to the tax in the approximate amount of $172, 519, and interest. However, Hunerlach never made any voluntary payments on the confessed tax liabilities.

In 1993 and 1994, Hunerlach was involved in two real estate transactions in Hilton Head, South Carolina. In 1993, Hunerlach, claiming to represent Dagny, contacted attorney Sydney Clark to purchase a lot at the Bridgeport Shipyard Plantation. In 1994, Hunerlach contacted attorney Jack Biel concerning the purchase of a unit at Oceanwalk Condos on South Forrest Beach. During the transaction, Biel dealt solely with Hunerlach and no one else. On May 6, 1994, Hunerlach, signing as an agent of Dagny, agreed to purchase the Oceanwalk Condo for $65,000. As earnest money, Hunerlach provided a check written on a personal bank account in the names of Hunerlach and his wife.

Paul Cale of Hilton Head Vacation rentals managed both of the properties. Hunerlach told Cale that he was an agent for Dagny. He also told Cale to hold the collected rent in an escrow account until further direction from Hunerlach. The properties produced approximately$10,000.00 to $13,000.00 in gross income. Cale made some checks payable to Dagny but, at Hunerlach's instruction, sent the money to Hunerlach at his home in Fort Pierce, Florida.

On May 19, 1994, Hunerlach met with IRS Revenue Officer Michael Stone pursuant to a summons to discuss the collection of Hunerlach's tax liabilities. During the meeting, Stone asked questions that appeared on IRS Form 433A (Collection Information Statement for Individuals), and Hunerlach responded to the questions. Stone filled out the Form based on the answers given by Hunerlach, and at the end of the meeting, Hunerlach signed the form.[5] Hunerlach provided false information to Stone regarding his assets, which Hunerlach later certified as true by signing the Form.

Several years later, in June of 1997, IRS special agents John Wilkinson and Dan Dockum met with Hunerlach, at Hunerlach's request. At the beginning of the interview, Wilkinson informed Hunerlach that, as a special agent, Wilkinson investigated the possibility of criminal violations, and that he wanted to ask a few questions regarding Hunerlach's tax liabilities. Wilkinson then advised Hunerlach of his rights under the Fifth Amendment. Hunerlach acknowledged that he understood his rights and proceeded to answer numerous questions on a variety of topics. On several occasions during the taped interview, the agents asked Hunerlach if he would

_____

[5] Form 433A contained a certification clause which states: "[u]nder penalties of perjury, I declare that to the best of my knowledge, and belief this statement of assets, liabilities, and other information is true correct and complete."

-5-

sign a waiver that would permit Barclay Bank to release Hunerlach's foreign bank records, but Hunerlach refused to sign such a waiver.

A grand jury returned a two-count indictment against Hunerlach on September 23, 1997. Count I charged Hunerlach with willfully evading the payment of tax, a violation of 26 U.S.C. § 7201. Count II charged him with willfully submitting false information on a statement, a violation of 26 U.S.C. § 7206.

Before trial, Hunerlach moved to dismiss Count I based on statute of limitations. That motion was denied. During the course of the trial, the district court admitted, *inter alia*, evidence of Hunerlach's refusal to sign a waiver to his Barclay Bank account, and the reasons that he gave for refusing to sign the waiver. Moreover, the district court admitted, over Hunerlach's objection, testimony of a case agent which relayed conversations with Osman and Higgs (alleged officers of Hunerlach's foreign corporations), which showed they were not real directors of the corporation, but that they were mere nominee directors. At the end of the prosecution's case, Hunerlach moved for judgment of acquittal based on sufficiency of the evidence. The district court denied the motion. A jury convicted Hunerlach on both counts.

At sentencing, the district court found that the total "tax loss" was over $3,000,000.00, which included the interest and penalties that accrued from 1981 to 1988. As such, the district court assigned a base offense level of 21 pursuant to

U.S.S.G. § 2T4.1 (1997). The district court enhanced the base offense level by four levels, pursuant to § 2T1.1(b)(2) and § 3C1.1. Hunerlach's criminal history category was I, which yielded a sentencing range of 57 to 71 months. However, due to the statutory sentence maximum of five years and three years for Count I and Count II, respectively, the district court sentenced Hunerlach to a term of 60 months imprisonment for Count I, and 36 months for Count II, to run concurrently.

## II. ISSUES

Appellant raises the following issues on appeal:

1.  Whether the district court erred in denying Hunerlach's motion to dismiss Count I based on the statute of limitations;

2.  Whether the district court erroneously admitted evidence in violation of Hunerlach's constitutional rights;

3.  Whether the district court erred in denying Hunerlach's motion for judgment of acquittal on Count II of the indictment based on sufficiency of the evidence;

4.  Whether the district court erred in including interest and penalties in calculating "tax loss" for the purposes of determining Hunerlach's base offense level.

## III. DISCUSSION

A.  Statute of Limitations

Appellant argues that the district court should have dismissed Count I of the indictment because it was barred by the statute of limitations. We review the district court's interpretation and application of statute of limitations *de novo*. See United States v. Gilbert, 136 F.3d 1451, 1453 (11th Cir. 1998) (citations omitted).

As noted before, Count I charged Appellant with a violation of 26 U.S.C. § 7201, which states in relevant part, "[a]ny person who willfully attempts in any manner to evade or defeat any tax imposed . . . or the payment thereof shall, . . . be guilty of a felony . . . ." 26 U.S.C. § 7201. In cases of willful evasion of payment, there is an additional element that the taxpayer engages in some affirmative act constituting an evasion of payment of tax. See Sansone v. United States, 380 U.S. 343, 351 (1965). In United States v. Winfield, 960 F.2d 970, 972 (11th Cir. 1992), we considered in a 28 U.S.C. § 2255 context whether the crime of willful tax *evasion*, 26 U.S.C. § 7201, includes acts of evasion that occurred after the tax return was due for the purposes of calculating the statute of limitations period. In that case, we applied the rule in United States v. Beacon Brass Co., 344 U.S. 43, 73 S. Ct. 77 (1952), and held that they did. See id.

Appellant does not appear to dispute that in evasion of *assessment* cases, the statute of limitation begins to run from that last act of concealment. He does argue, however, that "extension of the limitations period in evasion of payment cases to

-8-

commence upon the last affirmative act of evasion of payment, operates to eliminate the statute of limitations" because if the Appellant refuses to pay, as in this case, and he continues to engage in any financial transactions rather than pay his taxes, he would be subject to continued prosecution. We reject this argument.[6]

First, Appellant cites no authority, nor can the Court find such authority, that draws a distinction between evasion of assessment and payment for the purposes of applying the statute of limitations. Second, we find no reason to apply different limitations rules for evasion of assessment and payment of taxes. Both crimes appear to be designed to punish the same underlying conduct -- the evasion of tax. See United States v. Masat, 896 F.2d 88, 91 (5th Cir. 1990); see also United States v. Mal, 942 F.2d 682, 688 (9th Cir. 1991) ("[e]vasion of payment and evasion of assessment are not distinctly different kinds of conduct . . . . We thus conclude that § 7201 charges only the single crime of tax evasion, and that an individual violates the statute either by evading the assessment or the payment of taxes.") Thus, at least for the purposes of applying the statute of limitations, we hold that the statute of limitation for willful evasion of *payment* also begins to run from the last affirmative act of evasion, even if the act occurs past six years from the date which the tax is due. See,

_____

[6]Initially, we note that since Appellant does not challenge the fact that he committed affirmative acts of evasion within the six-year period prior to the date of indictment, the sole issue becomes when the six-year period begins to run.

e.g., United States v. Ferris, 807 F.2d 269, 272 (1st Cir. 1986) (holding that prosecution under § 7201 was not barred by the statute of limitations because affirmative act of evasion occurred within six years prior to date of indictment); United States v. Trownsell, 367 F.2d 815, 816 (7th Cir. 1966) (*per curiam*) (holding that statute of limitation for evasion of *payment* did not run because the last affirmative act occurred within six years prior to indictment.) In this case, the record shows, and Appellant does not contest, that he committed several affirmative acts of evasion within the six years immediately preceding the indictment, one of which was to hide rental income from the government by purchasing the rental property in the name of Dagny. Accordingly, we affirm the district court's denial of Appellant's motion to dismiss Count I.

B.     Evidentiary issues

Appellant next argues that the district court erred in admitting the recorded June 1997 interview with IRS agents, which included his refusal to sign a waiver allowing Barclay Bank to release his financial records, and his explanations as to why he was refusing to sign a waiver. Appellant argues that his refusals to sign the waiver and his explanations as to refusal were protected under his Fifth amendment rights. Moreover, he argues that the district court erred in allowing Agent Wilkinson to testify regarding statements made by Osman and Higgs that they were nominee

directors of Dagny and DTS, in violation of his Sixth Amendment rights. Since Appellant is challenging the district court's evidentiary rulings, we review only for "clear abuse of discretion." See United States v. Ross, 131 F.3d 970, 987 (11th Cir. 1997).

### 1.    Fifth Amendment

Appellant argues that his refusal to sign a waiver, and particularly his reasoning therefore, constituted an invocation of his Fifth Amendment privilege.[7] Thus, he contends that the district court erred in admitting the tape of the interview, and permitting the prosecutor to refer to his refusal to sign the waiver during closing arguments. In contrast, the government argues that Appellant's refusal to sign the waiver was not a "testimonial communication," and thus, no privilege attached to that act. Moreover, the government argues that since the portions of the tape and transcript at issue were not the result of any compulsion, the district court did not err in admitting such evidence.

The Self-Incrimination Clause of the Fifth Amendment reads: "No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has explained that the privilege protects a person only

---

[7]Interestingly, the record does not show that Appellant filed a pre-trial motion to suppress the statements he made during the interview.

against being incriminated by his own compelled testimonial communications. See Doe v. United States, 487 U.S. 201, 207, 108 S. Ct. 2341, 2345 (1988) (citations omitted.) To that extent, we must determine whether Appellant's refusal to sign a waiver, and the reasons given therefore, was "compelled," and whether such refusal was a "testimonial communication."

First, our review of the record reveals that Appellant was not compelled to sign a waiver. Appellant was not under a court order, or a subpoena, or any other compulsion to release his records.[8] Thus, although Appellant could have refused to

---

[8]Generally, the privilege attaches either when a person is legally compelled to testify, e.g., subpoena or a court order, or during a "custodial interrogation," where the compulsion comes from the custodial environment. See, e.g., Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966); United States v. Howard, 991 F.2d 195, 200 (5th Cir. 1993) ("The defendant's Fifth Amendment right against self-incrimination does not attach until custodial interrogation has begun.")

In this case, there is no question that Appellant was not subject to a subpoena or another court order to testify at the time of the taped interview. Moreover, it is also clear that Appellant was not under "custody" when he was interviewed. The question of whether a person is in custody is viewed from the perspective of a reasonable person in the position of the suspect. See United States v. Adams, 1 F.3d 1566, 1575 (11th Cir.1993). In this case, the record shows that Appellant had voluntarily requested the meeting, and that he was notified of, and had acknowledged understanding of, his rights. As the Supreme Court has held, when a defendant's attendance at a meeting is voluntary, the meeting is not a "custodial interrogation" for the purposes of triggering even the most basic of the Fifth Amendment protection -- the Miranda warnings. See e.g., Oregon v. Mathiason, 429 U.S. 492, 97 S. Ct. 711 (1977) (defendant that came to police station voluntarily, though at the request of police officer, was not subject to custodial interrogation to trigger Miranda.) Under the facts of this case, a reasonable person in the Appellant's position would not believe that he was under custody, or any type of compulsion. Nothing in the record

sign, he could not refuse to sign based on the Fifth Amendment privilege. Second, even if we assume that he was compelled to sign, the signing of a waiver authorizing the release of foreign bank records is not necessarily a "testimonial communication" that is protected by the Fifth Amendment privilege. See e.g., Doe, 487 U.S. at 217. "In its testimonial significance, the execution of such a directive is analogous to the production of a handwriting sample or voice exemplar[.]" Id. Similarly, we hold that the refusal to sign a waiver has no testimonial significance because it does not relate a factual assertion or disclose information. Therefore, we conclude that the refusal to sign the waiver is not "testimonial communication" that is protected under the Fifth Amendment privilege. Accordingly, we hold that the district court did not abuse its discretion by admitting the taped interview.

2.      Confrontation Clause

Appellant next argues that the district court erred in admitting hearsay statements by Higgs and Osman to prove that Dagny and DTS were not *bona fide* corporations in violation of the Confrontation Clause of the Sixth Amendment. The government argues that the statements were not hearsay because they were not offered for the truth of the matter asserted, and that even if they were hearsay, the error was harmless.

_____

shows that Appellant could not have simply walked away from the interview.

Federal Rules of Evidence defines hearsay as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). In this case, Agent Wilkinson testified that he spoke to Osman, and that in response to a question as to what Osman did for a living, Osman told him that he was a "rat catcher." With respect to Higgs' occupation, he told Wilkinson that he was an attorney and a "nominee director for one of the corporations." The record reflects that the government offered these statements in order to prove that Dagny and DTS were not *bona fide* corporations, and that the corporations were solely under the control of Appellant. These statements appear to be hearsay for the simple reason that notwithstanding the truth of the matter asserted, the statements would be irrelevant to any issue in the case. Therefore, we hold that the district court abused its discretion by admitting the statements.

Even if the evidence were erroneously admitted, however, petitioner would not be entitled to prevail on appeal if that error is harmless beyond a reasonable doubt. See generally Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986) (no reversal of conviction if Confrontation Clause violation harmless beyond

a reasonable doubt).[9] We conclude that the error was harmless in light of the substantial evidence that Dagny and DTS were not *bona fide* corporations.  There is substantial evidence in the record that Appellant used Dagny and DTS to keep the IRS from "snatching" his assets.  Although the business transactions, e.g., real estate transactions, were conducted through Dagny and DTS, Appellant made all the decisions without participation from other "officers" or "directors" of Dagny or DTS. This is evident from testimony of various participants of the business transactions of Dagny and DTS.  The witnesses testified that they had dealt directly only with Appellant during the deal.  In addition, there is evidence that Appellant directly received rental income from properties owned by Dagny or DTS.  Based on these pieces of evidence, a jury could easily have found that Dagny and DTS were not *bona fide* corporations.

---

[9]The Supreme Court has instructed that under the harmless error review, the correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, we might nonetheless say that the error was "harmless beyond a reasonable doubt."  Factors that determine whether such an error is harmless include: the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.  See id. at 684-85.

Therefore, we hold that the admission of the hearsay statements were harmless,[10] and affirm Appellant's conviction under § 7201.

C.    Sufficiency of the evidence issue

Appellant argues that the district court erred in denying his motion for judgment of acquittal as to § 7206(1) charge in Count II of the indictment.  He asserts that the government failed to prove that he read and understood Form 433A before he signed it.  Moreover, for the first time on appeal, Appellant argues that under our binding case law, Form 433A is not a "return" or "statement" that could serve as a basis for a conviction under § 7206(1).[11]

We subject a sufficiency of evidence challenge, a question of law, to *de novo* review.  See United States v. Cannon, 41 F.3d 1462, 1465 (11th Cir. 1995) (citing

---

[10]Moreover, we need not focus solely on Appellant's use of Dagny and DTS to avoid payment in order to affirm his conviction under § 7201.  Appellant's false statements to IRS agent Stone regarding his assets can constitute an affirmative act of evasion which can sustain a conviction under § 7201.  During oral arguments, Appellant's counsel argued that such dual use of his statements to Agent Stone would implicate the Double Jeopardy Clause.  This argument lacks merit.  The two crimes, §§ 7201 and 7206, require proof of different elements.  Section 7206 requires a person to willfully make and subscribe to a fraudulent tax return, while § 7201 criminalizes attempts in any manner to evade or defeat tax.

[11]That section prohibits a person from "[w]illfully mak[ing] and subscrib[ing] any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . ." 26 U.S.C. § 7206(1).

United States v. Kelly, 888 F.2d 732, 739 (11th Cir. 1989)).  However, this court must view the evidence in the light most favorable to the Government.  See Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469 (1942).  Applying this standard of review, we are obliged to uphold a verdict which is supported by substantial evidence.  See Hamling v. United States, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911 (1974).

There is sufficient evidence in the record to support a finding beyond a reasonable doubt that Appellant knew the contents of the form.  The record shows that Agent Stone read the questions from Form 433A to Appellant, and that he recorded Appellant's answers onto the form.  The questions on the form sought to elicit answers regarding Appellant's assets.  It is undisputed that Appellant did not disclose properties that he owned.  Moreover, it is undisputed that Appellant signed the form in the presence of Agent Stone, despite the fact that the form contained false information.  Based on these pieces of evidence, a jury could have easily found beyond a reasonable doubt that Appellant knew that the contents of Form 433A were false, and that he signed the form.[12]  Therefore, we reject Appellant's sufficiency argument.

---

[12]Even Appellant admits that the signature alone raises an inference that he knew the contents of the form.

Appellant's second argument merits some discussion. In essence, he argues that under our binding precedent in United States v. Levy, 533 F.2d 969 (5th Cir. 1976),[13] Form 433A cannot serve as a basis for § 7206(1) conviction. Since the record does not show that Appellant raised this issue to the district court, our review of the district court's decision to deny the motion for judgment of acquittal on that basis is only for "plain error." See United States v. Olano, 507 U.S. 725, 731-32, 113 S. Ct. 1770, 1776 (1993). "Our power to review for plain error is 'limited and 'circumscribed.'" United States v. Humphrey, 164 F.3d 585, 588 (11th Cir. 1999) (citation omitted). As the Supreme Court has directed, an error that was not raised before the district court may be "noticed" only if it is "plain" and "affect[s] substantial rights." Olano, 507 U.S. at 732.

In Levy, Levy, a lawyer, was convicted for violating § 7201(1) by signing and delivering an allegedly false Form 433-AB when approached by an IRS agent about taxes that Levy admittedly owed, but which he claimed he was unable to pay. See Levy, 533 F.2d at 970. In reversing the conviction, the former Fifth Circuit interpreted the terms "statement or other document" under 6 U.S.C. § 7206(1) not to include Form 433-AB. See id.

_____

[13]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

It is not necessary in this case to determine whether Levy would have controlled the outcome of this issue had Appellant raised it at the trial level. It does not dictate a reversal in this case, because Levy and the case *sub judice* are sufficiently dissimilar to preclude a finding that the district court committed "plain error." First, unlike Levy, Appellant met with Agent Stone pursuant to a civil summons. Second, Appellant, as part of his plea agreement, was to pay his income tax obligations for the years 1981-83 within a reasonable time. Furthermore, Appellant's agent, through a power of attorney, signed a Form 870 "Waiver of Restriction on Assessment and Collection of Deficiency in Tax and Acceptance of Over-assessment," in which Appellant consented to the immediate assessment and collection of his tax liabilities. These agreements created at least an implied obligation for Appellant to cooperate and facilitate the collection process, which may include, filing a Form 433A. None of these factors, however, were present in Levy.

Even if we were to assume that the district court committed plain error, in order to get the relief he requests, Appellant must show that the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Johnson v. United States, 520 U.S. 461, 469, 117 S. Ct. 1544, 1550 (1997) (citation omitted). Based on the record before us, we simply do not find that the district court's oversight would have a serious effect on the integrity of the judicial system.

In sum, due to the factual dissimilarities between <u>Levy</u> and the case instanter, we cannot conclude that the district court committed "plain error," nor can we find that such an error seriously affects the integrity of the judicial system to warrant a reversal of the conviction. Accordingly, we affirm the district court's decision to deny Appellant's motion for judgment of acquittal.

D.     Sentencing issue

Appellant also challenges the 60 month sentence of imprisonment he received as a result of his convictions. Specifically, he argues that the district court erred by including interest and penalties in calculating the "tax loss" amount under U.S.S.G. § 2T1.1, for the purpose of calculating his base offense level. In contrast, the government argues that the plain meaning of "tax loss" includes interest and penalties because the term is directed to encompass the total amount of loss that Appellant intended to cause by his actions. Since this issue deals with an interpretation of the Sentencing Guidelines, we review the district court's decision *de novo*. <u>See</u> <u>United States v. Maurice</u>, 69 F.3d 1553, 1556 (11th Cir. 1995).

Pursuant to U.S.S.G. § 2T1.1(a), the base offense level for tax evasion, or the payment thereof, is the greater of the "level from § 2T4.1 (Tax Table) corresponding to the tax loss" or 6, if there is no tax loss. In this case, the district court found that the total amount of loss was $3,029,737.78, which included the interest and

penalties.[14] The government argues that under a plain reading of § 2T1.1(c)(1), which defines tax loss as "the total amount of loss that was the subject of the offense (i.e., the loss that would have resulted had the offense been successfully completed), the district court correctly included the interest and penalties as a part of the "tax loss." See, e.g., United States v. Pollen, 978 F.2d 78, 91 n. 29 (3rd Cir. 1992) (suggesting that the inclusion of interest and penalties may be appropriate in evasion of payment cases.)

Although the language in § 2T1.1(c) can be read to include interest and penalties in calculating "tax loss," we find that the phrase "total amount of loss that is subject to the offense" could also be read as not including interest and penalties. See, e.g., United States v. Hopper, 177 F.3d 824, 832 (9th Cir. 1999) (holding that given the "plain language" of the Guidelines, the district court erred in including interest and penalties in the amount of tax loss.) Thus, we reject the government's argument that the plain language controls the outcome of this case, and find that the language used in the guideline provision is ambiguous.

---

[14]The tax table in § 2T4.1(P) assigns a base offense level of 21 for any amount more than $ 2,500,000.00 but less than $ 5,000,000.00. Had the interest and penalties not been included in the "tax loss," Appellant's initial base offense level would have been 17 since the principal amount of the tax liability was approximately $540,000.00.

However, the Commentary to the section resolves the ambiguity in the provision. In Application Note 1, the Commission unequivocally states that "[t]he tax loss does not include interest and penalties." U.S.S.G. § 2T1.1 comment. (n.1) (1997). Based on this language, the Ninth Circuit found that the term "tax loss" does not include interest and penalties.

Although we do not find the language as "plain," as the <u>Hopper</u> court did, we agree with the Ninth Circuit's holding that the term "tax loss" in § 2T1.1 does not include interest or penalties.[15] The language in the commentary is clear: interest and penalties are excluded from the definition of "tax loss." In light of the commentary, no other interpretation would be reasonable.

---

[15]In so holding, we are mindful of the fact that excluding interest and penalties in evasion of payment cases might not achieve the maximum accountability on the part of a defendant. Nevertheless, we must follow what the Sentencing Commission has unequivocally stated in its commentary, since it is the best evidence of the Commission's intent, notwithstanding the language used in the actual Guidelines themselves.

In addition, we find no merit in the government's argument that our holding would conflict with 26 U.S.C. § 6601(e), which states that " any reference in this title . . . to any tax imposed by this title shall be deemed also to refer to interest imposed by this section on such tax." Since imposition of a tax is wholly independent from the imposition of a sentence for evasion thereof, we find no conflict between the Guideline language in § 2T1.1 and the Internal Revenue Code.

Accordingly, we hold that the district court erred in including interest and penalties in the "tax loss" for the purpose of determining Appellant's base offense level.

## IV.  CONCLUSION

We AFFIRM the conviction on both counts, but we VACATE the sentence imposed and REMAND for re-sentencing in accordance with this opinion.