[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-12245
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 16, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00085-CR-CO-S

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BOBBY RAY SMART,
a.k.a. John Deere,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 16, 2005)

Before BIRCH, CARNES and MARCUS, Circuit Judges.

PER CURIAM:

Bobby Ray Smart, a.k.a. John Deere, appeals his conviction and 151-month

sentence for conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), 1956(h). On appeal, Smart argues that the district court erred by denying his motions for judgment of acquittal because the evidence submitted to the jury was insufficient to support his conviction. In addition, Smart argues that the district court erred by denying his motion for a downward departure from the sentencing range established by the Sentencing Guidelines. Because there was sufficient evidence presented to the jury on the money laundering conspiracy charge and because the district court did not err at sentencing, we **AFFIRM**.

## I. BACKGROUND

In May 2003, a federal grand jury returned an indictment charging Smart, along with several other individuals, with conspiracy to possess with the intent to distribute more than 500 grams of methamphetamine and conspiracy to commit money laundering. Smart entered a plea of not guilty on both counts and the case proceeded to trial before a jury.

The government began its case with the testimony of David Fowler, an agent with the Drug Enforcement Agency ("DEA"), who testified that he and other DEA agents began investigating in August 1999 a group that they suspected was trafficking methamphetamine. The agents suspected that Rafael Antonio Aguilar (a.k.a. "Big Tony"), an illegal alien living in California, was responsible for

supplying large quantities of the drug to Blount County, Alabama. According to the DEA, Big Tony had three people who would receive drug shipments in Alabama and subsequently deliver the drugs to dealers for distribution. One of Big Tony's three Alabama-based receivers was Arturo Castrejon.

Although Castrejon was indicted along with Smart, he pled guilty and testified as a witness for the government. Castrejon testified that Big Tony had introduced him to Smart in 2001 so that he could deliver drugs to Smart. When they were introduced, Castrejon knew Smart only as "John Deere." Castrejon testified that this pseudonym was derived from the fact that Smart had a John Deere mailbox in front of his house. Castrejon testified that he recalled delivering methamphetamine to Smart's house at least four times. He stated that sometimes Smart would pay him when the drugs were delivered and sometimes he would not. Agent Fowler later testified that this practice, called "fronting," was typical in the drug trafficking business. Fowler stated that distributors would give, or "front," the drugs to the dealers on consignment, and then the dealers would pay the distributors the proceeds from the sale of the first delivery of drugs when additional shipments were delivered. To support this testimony, Castrejon described how, in March 2002, he consented to a search of his house by DEA agents. He testified that the agents found, inter alia, a ledger book and

3

approximately $80,000. He testified that the ledger book contained an entry listing "John Deere" and "7,000," which signified that Smart paid Castrejon $7,000 for a drug delivery. Castrejon further testified that the next line on the ledger was dated 16 July 2001 and read "mas uno" and "3000," which meant that Smart received an additional pound of methamphetamine and paid him an additional $3,000. Castrejon could not recall whether the payments noted in the ledger were for drugs that had been previously delivered or for drugs that were exchanged that day. While these were the only two recorded transactions between Smart and Castrejon, Castrejon testified that there were others which he did not record in the ledger. After the March 2002 search, Castrejon was arrested and placed in jail.

Next, the government offered the testimony of Becky Castro, who worked with Castrejon's wife, Aneli Castrejon, and Terry Faucett. Following Castrejon's arrest, Castro testified that Aneli came to her house to ask for Castro's help to get the money together to bail Castrejon out of jail. Aneli indicated to Castro that she wanted to go to Smart's house to collect on money she knew Smart owed her husband. Following this encounter, because they did not want to be involved in any illegal activity, Castro and Faucett reported to local police authorities what Aneli had said. Local police referred them to the DEA, and Castro and Faucett subsequently agreed to be informants for the DEA. On 13 April 2002, after

4

becoming DEA informants, Castro and Faucett accompanied Aneli to Smart's house to ask for the money Castrejon was owed. They traveled in Castro's car because Castro's husband, Efrain, worked for Smart and therefore Smart would recognize their car. Castro testified that Smart told them to come back in a few days when he would have the money. Within a week, Aneli called Castro and indicated that Smart had the money owed to Castrejon. Castro and Faucett then returned to Smart's house and received from him an envelope containing $7,000 and a note which read: "I owed 10,000. Here's 7,000. I already paid restaurant man 3,000. We're even now for now."[1] R5-319 at 138. The envelope was addressed to "Efrain" so that it appeared as though the money was to be given to Efrain Castro as his wages for the legitimate work he performed for Smart. Castro and Faucett then took the envelope to Aneli Castrejon.

Aneli Castrejon, like her husband, was indicted for participation in the methamphetamine conspiracy, pled guilty, and testified for the government. She testified that she had accompanied her husband to Smart's residence two times prior to going to the residence with Castro and Faucett. She admitted that she went

___

[1] Steven Drexler, a government witness who testified as an expert in handwriting analysis, testified that he had a "90 percent confidence level" that the note was written by Smart. R6-319 at 314. According to the government, the mention of "restaurant man" in the note was a reference to Arturo Castrejon, who owned a Mexican restaurant. Appellee's Br. at 12 n.5 (citing R5-319 at 99).

to Smart's house with Castro and Faucett at her husband's direction to secure money that was owed to him and that would eventually be paid to Big Tony for the drugs he supplied. Aneli also testified that she contracted for the use of four cellular telephone numbers, one of which she used, another of which her husband used, and two of which Big Tony and her husband used.[2]

After the government had finished presenting its case in chief, Smart moved for judgment of acquittal on both of the counts for which he was indicted because "no rational trier of fact could have found [Smart] guilty beyond a reasonable doubt" based on the evidence presented. R6-319 at 384. The district court denied the motion. At the close of all evidence, Smart renewed his motion for judgment of acquittal because "the evidence [was] insufficient to sustain a verdict." R7-319 at 479. Smart's motion was again denied. The case was then given to the jury which, on 12 September 2003, acquitted Smart of conspiracy to possess with the intent to distribute methamphetamine, but found him guilty of conspiracy to commit money laundering.

Subsequently, a probation officer compiled a presentence investigation report (PSR) and recommended, based on the Sentencing Guidelines

---

[2] Agent Fowler subsequently testified about phone records the DEA obtained which indicated that calls had been made from the telephone numbers described by Aneli to telephone numbers associated with Smart. In addition, Fowler testified that records he obtained regarding a cellular telephone contract signed by Big Tony listed Smart as Big Tony's employer.

("Guidelines"), a sentencing range of 151 to 188 months of imprisonment. On 17 February 2004, after Smart had already lodged his objections to the PSR, Smart filed a motion to augment his objections to the PSR in which he requested a downward departure at sentencing and renewed his motion for judgment of acquittal on the grounds that his conduct did not constitute criminal money laundering as a matter of law. The district court denied Smart's motion for a downward departure. The district court noted that, while the Sentencing Guidelines "permit me to vary from them in a downward departure under specific circumstances," the evidence presented by Smart, such as "being a good person, helping out the family, [and being] a good church member," did not warrant a downward departure. R9-322 at 25-26. Rather than ruling on the renewed motion for judgment of acquittal, the district court directed the government to file a response to the motion and indicated that Smart could argue his motion at a subsequent bond hearing. The district court then sentenced Smart to 151 months of imprisonment, the minimum under the applicable Guidelines range. Subsequently, without hearing argument, the district court dismissed Smart's renewed motion for judgment of acquittal because it found the motion was not timely filed.

Smart now appeals his conviction and sentence. He argues that the evidence

presented by the government was insufficient, as a matter of law and as a matter of fact, to support his conviction. He also argues that the district court erred at sentencing. We address each argument in turn.

## II. DISCUSSION

A. Money Laundering Conviction

Section 1956 of Title 18 of the United States Code provides criminal liability for any person who knowingly conducts a financial transaction which involves the proceeds of some unlawful activity with the intent to promote the carrying on of unlawful activity. 18 U.S.C. § 1956(a)(1)(A)(i).[3] The statute defines the term "transaction" as any "purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition." § 1956(c)(3). Construing this statute, we have determined that, to obtain a conviction for violating § 1956(a)(1)(A)(i), the government bears the burden of proving beyond a reasonable doubt that:

> (1) the defendant conducted or attempted to conduct a financial transaction; (2) the defendant knew the property involved in the transaction represented the proceeds of unlawful activity; (3) the property involved was in fact the proceeds of the specified unlawful activity; and (4) the defendant conducted the financial transaction 'with the intent to promote the carrying on of [the] specified unlawful activity.'

United States v. Calderon, 169 F.3d 718, 721 (11th Cir. 1999) (citation omitted).

_____

[3] Section 1956(h) provides for liability for any person who conspires to commit unlawful money laundering as defined in § 1956. 18 U.S.C. § 1956(h).

8

Based on these standards, we turn to Smart's two arguments that there was insufficient evidence to support his money laundering conviction. First, he argues for the first time on appeal that proof he paid money to a drug supplier cannot support his conviction as a matter of law because proof of money laundering must be separate from the proof required for conviction of the underlying offense of drug trafficking.[4] Second, Smart contends that the evidence presented to the jury was insufficient to meet the government's burden.

1. Sufficiency of the Evidence as a Matter of Law

When a defendant appeals a district court's denial of a motion for judgment of acquittal based on an issue that was not raised in the district court, we review for plain error. See United States v. Hunerlach, 197 F.3d 1059, 1068 (11th Cir. 1999). Our power to review for plain error is "limited" and "circumscribed." Id. (citation omitted). To satisfy the plain-error standard, we must find that (1) the district court committed error, (2) the error was plain or obvious, and (3) the error affected substantial rights. United States v. Cotton, 535 U.S. 625, 631, 122 S. Ct. 1781, 1785 (2002). If all three conditions are met, we may exercise our discretion to

---

[4] Smart first argued that his conduct did not amount to illegal money laundering as a matter of law in his renewed motion for judgment of acquittal. That motion, however, was denied because it was untimely. Because the raising of an issue in an untimely motion in district court is insufficient to preserve the issue for appeal, see United States v. Viscome, 144 F.3d 1365, 1370 (11th Cir. 1998), we consider Smart's insufficiency as a matter of law argument as being raised for the first time on appeal.

correct the error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

Assuming without deciding whether the district court committed error, we conclude that Smart's claim of insufficiency as a matter of law fails under the second prong of the plain error test. As Smart correctly observes, our court has not decided whether the payment of money by a drug dealer to a drug supplier for drugs that were previously "fronted" to the dealer on consignment, as alleged in this case, constitutes money laundering under § 1956(a)(1)(A)(i).[5] Other circuit courts addressing this issue, however, have split on whether payments to a supplier pursuant to a "fronting" arrangement can be considered laundering. Compare United States v. King, 169 F.3d 1035, 1039 (6th Cir. 1999) ("Payment for drugs may constitute 'promotion' for the purposes of the money laundering statute when such payment encourages further drug transactions."); United States v. Baker, 63 F.3d 1478, 1494 (9th Cir. 1995) (stating that paying a supplier was laundering which "promotes" the carrying on of the unlawful activity because the defendant

---

[5] In construing § 1956, we have determined that money laundering must be punished separately from an underlying criminal offense, and therefore the underlying offense must have been completed before any act of laundering can occur. See United States v. Christo, 129 F.3d 578, 579-80 (11th Cir. 1997) (per curiam). While we have decided that financial transactions involving illegally obtained funds which advance ongoing criminal conspiracies constitute money laundering under § 1956, see, e.g., United States v. Carcione, 272 F.3d 1297, 1303 (11th Cir. 2001), we have not decided in the context of "fronting" drugs when the underlying offense has been completed and, consequently, whether the subsequent payment of proceeds so that the dealer can continue to receive drug shipments to sell on consignment constitutes laundering.

10

"could not have continued the illegal trafficking without paying his . . . suppliers");
United States v. Torres, 53 F.3d 1129, 1137 n.6 (10th Cir. 1995) (finding that using proceeds from the sale of drugs "fronted" to a dealer to buy more drugs "satis[ied] the 'promotion' element of 1956(a)(1)(A)(i)"), with United States v. Dovalina, 262 F.3d 472, 476 (5th Cir. 2001) (concluding that a "promotion money laundering offense cannot be established merely by evidence of a single buyer's repeated payments to a distributor"); United States v. Heaps, 39 F.3d 479, 485 (4th Cir. 1994) (reversing a conviction for money laundering and noting that "[w]ere the payment for drugs itself held to be a transaction that promoted the unlawful activity of that same transaction[,] virtually every sale of drugs would be an automatic money laundering violation as soon as money changed hands"). We have held that, "where neither the Supreme Court nor this Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue." United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) (per curiam). Accordingly, because it is not clear under current law whether a money laundering offense has been committed when a drug dealer gives drug sale proceeds to a drug supplier for previously "fronted" drugs so that additional shipments can be obtained, it was not plain error for the district court to deny Smart's motions for judgment of acquittal where he failed to raise the issue before

11

the district court. Smart's claim that there was insufficient evidence as a matter of law to support his money laundering conviction thus fails under the second prong of the plain error test.

2. Sufficiency of the Evidence as a Matter of Fact

We review de novo a defendant's claim of insufficient evidence in fact to sustain a conviction. See United States v. Christo, 129 F.3d 578, 579 (11th Cir. 1997) (per curiam). In making this determination, we "view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." See id. (citation omitted). Under this standard, we are required to affirm a conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. (citation omitted).

Based on this standard, we reject Smart's contention that the government failed to present facts which proved its case on the money laundering charge. The evidence demonstrated that Smart made at least three payments: one in the amount of $7,000 to Castrejon in early 2001, one in the amount of $3,000 to Castrejon in July 2001, and another payment in the amount of $3,000 to Castro in 2002 for money he owed to Castrejon. Moreover, the government presented evidence which indicated that Smart was involved in the trafficking of methamphetamine

12

with Castrejon and Big Tony. In addition, the government described the process of "fronting," in which drugs were given to dealers to be sold on consignment and then the proceeds were paid to suppliers in exchange for the continued receipt of subsequent drug shipments. Viewed in the light most favorable to the government, we conclude that a rational trier of fact could have concluded that Smart's payments of money constituted transactions involving proceeds from his sale of methamphetamine which was given to him by Arturo Castrejon and that these payments were made so that Smart would continue to receive drug shipments from Castrejon. Accordingly, there was sufficient evidence to support Smart's conviction for money laundering under § 1956(a)(1)(A)(i).

B. Downward Departure

Next, Smart argues that the district court erred at sentencing by denying his motion for a downward departure based on his de minimis role in the overall drug trafficking conspiracy because the court misunderstood its authority to depart downward. While we "generally may not review the merits of a district court's refusal to grant a downward departure, [we] may conduct a de novo review of a defendant's claim that the district court mistakenly believed it lacked the authority to grant such a departure." United States v. Mignott, 184 F.3d 1288, 1290 (11th Cir. 1999) (per curiam). When nothing in the record indicates otherwise, we will

13

assume that the district court understood it had the authority to depart downward, thus precluding review. See United States v. Chase, 174 F.3d 1193, 1195 (11th Cir. 1999).

Our review of the sentencing record demonstrates that the district court was not mistaken about its authority to make a downward departure based on a defendant's de minimis role. The district court noted that Smart articulated two reasons why his case merited a downward departure: (1) he was a good person and was active in the community; and (2) he had a minor role in a larger drug trafficking conspiracy. With regard to the first reason, the district court was unclear as to whether the Guidelines permitted a downward departure. See R9-322 at 26. Because Smart's appeal is limited to the district court's denial of a downward departure based on his de minimis role, however, this lack of clarity is irrelevant to our inquiry in the instant appeal. Rather, we focus on the district court's analysis of Smart's claim that he was entitled to a downward departure based on his minor role. With regard to this argument, the district court tacitly acknowledged that it had the authority to depart downward from the Guidelines because it unambiguously stated that a downward departure was not merited based on the facts of Smart's case. See id. As a result, we are precluded from reviewing the district court's refusal to make a downward departure in sentencing Smart. See

14

United States v. Harness, 180 F.3d 1232, 1237 (11th Cir. 1999) (finding that it lacked jurisdiction to review a district court's denial to make a downward departure where the district court recognized its authority to downwardly depart but refused to exercise its discretion to do so based on the facts of the case).

### III. CONCLUSION

Following Smart's conviction of conspiracy to commit money laundering, the district court sentenced Smart to 151 months of imprisonment. In reviewing his conviction and sentence, we have rejected his claims that there was insufficient evidence as a matter of law and as a matter of fact to support his conviction and that the district court erred at sentencing by refusing to grant a downward departure. Accordingly, Smart's conviction and sentence are **AFFIRMED.**