[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-12722
Non-Argument Calendar
_____

D.C. Docket No. 3:15-cr-00312-MHT-TFM-1

UNITED STATES OF AMERICA,

                                              Plaintiff - Appellee,

versus

MICHAEL T. CLEMENTS,

                                              Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(April 3, 2017)

Before TJOFLAT, HULL, and WILLIAM PRYOR, Circuit Judges.

PER CURIAM:

Defendant Michael Clements appeals his conviction and 60-month probationary sentence. A jury found Clements guilty on one count of aiding and abetting the sale of ammunition to an illegal alien, in violation of 18 U.S.C. §§ 922(d) and 924(a)(2). On appeal, Clements argues that the government failed to introduce sufficient evidence to support his conviction. After careful review of the record and the briefs, we affirm Clements's conviction and sentence.[1]

## I.  BACKGROUND

### A.    Jesus Licona Serves As a Confidential Informant

In 2008, Auburn, Alabama police officer Chris Carver recruited Jesus Licona to work as a confidential informant. As a twelve-year-old child, Licona entered the country illegally from Mexico in the early 2000s. Licona learned English over the years he subsequently spent in the United States.

In 2008, Licona met Carver by approaching Carver as he was finishing an unrelated police call in the Auburn community. Licona told Carver that he wanted to "help [the government] out" in exchange for government assistance with some traffic tickets that Licona had received, as well as with a few other prior issues with law enforcement. Carver asked Licona whether he was in the United States legally. Licona replied that he was not.

---

[1]Clements's advisory guidelines imprisonment range was 15 to 21 months, but the district court applied a downward variance, making Clements eligible for a probationary sentence. See U.S.S.G. §§ 5B1.1(a)(2), 5B1.1(c)(3). The parties have challenged neither the advisory guidelines calculations nor the reasonableness of Clements's sentence.

After the initial meeting with Licona, Carver conducted several additional interviews of Licona to vet him and to "determine who he was aware of" in the community. Carver began using Licona as a confidential informant. Since 2008, the government has paid Licona $12,000 for his work as a confidential informant.

In 2011, after Licona had worked for Carver for several years, Carver attempted to help improve Licona's immigration status in the United States. Carver contacted a Department of Homeland Security ("DHS") office in Montgomery, Alabama and tried to get Licona documented as a legal immigrant. Specifically, Carver tried to enroll Licona in the Significant Public Benefit Parole program, which allows illegal aliens who are informants for law enforcement to gain lawful status in the United States. DHS created a file on Licona, and Carver periodically checked in with DHS about the status of Licona's paperwork. However, Carver's attempts with DHS were unsuccessful. Carver "never really got a clear answer on what the status was" before his DHS contact transferred to a different office.

**B.    Defendant Clements's Sales at His Trailer**

In January 2013, while working as a confidential informant, Licona heard through a friend that defendant Clements was selling stolen electronics and firearms from a trailer. Licona went to the trailer to purchase several items in an attempt to "f[i]nd out what he was doing." At the trailer, Licona purchased a

television and a few other items from Clements. Licona did not know "if it was legal or illegal" for Clements to sell them.

After buying those items, Licona showed Carver where Clements made his sales, and Carver began an investigation into Clements. Carver coordinated a series of controlled buys from Clements in order to determine "whether . . . we were consistently purchasing stuff that we were able to determine was stolen."

On March 6, 2013, Carver and Licona set up a controlled buy with defendant Clements at Clements's trailer. Licona purchased a stolen laptop from Clements. During the transaction, Licona asked Clements if he had a gun for sale. Clements told him that he did not have one but that he would look for one for Licona.

On February 11, 2014, Licona went to defendant Clements's trailer to make another controlled buy. Licona purchased a television from Clements which was not stolen. Licona took photographs to memorialize the contents of Clements's trailer. The photographs did not show any firearms inside the trailer.

On April 2, 2014, Licona went to defendant Clements's trailer to make another controlled buy. Licona purchased another laptop which was not stolen. Licona repeated his request to purchase a firearm. Clements told Licona that he could not sell him a firearm but that he would give Licona the name and telephone number of someone who could.

4

On May 14, 2014, Licona went to defendant Clements's trailer to make another controlled buy. Licona purchased a cell phone, a laptop, and a tablet; none of these items were stolen. Licona again asked Clements about purchasing a firearm. Clements told Licona that he could not sell him a gun "because he was a police officer." Clements told Licona that a colleague named "Willie Arnold" could sell him a gun, and Clements later called Arnold on the telephone to talk about it.

On July 17, 2014, Licona called Clements to discuss a possible gun purchase. Clements told Licona that he would "rather you deal directly with [Arnold]" to conduct the gun purchase. Licona responded by asking Clements to "help [him] with the buy" and to set up a gun purchase at Clements's trailer.

On July 18, 2014, defendant Clements arranged for Licona to buy a Smith and Wesson .357 magnum from Arnold later that day. The purchase occurred at Clements's trailer. Clements, Arnold, and Licona were present. Licona recorded the purchase.

During the recording, Arnold asked Licona if he had ever been arrested or had run into trouble with the police. Licona lied and said that he had not. Neither Arnold nor Clements asked about Licona's immigration status. After Arnold finished asking Licona about his background, Licona purchased an unloaded gun

5

from Arnold for $350. Defendant Clements prepared the bill of sale to memorialize the transaction and signed it as a witness.

Following the July 18, 2014 gun purchase, Carver sought an indictment of defendant Clements with the U.S. Attorney's Office. Carver's inquiry led him to believe that the gun purchase alone would be insufficient to sustain a conviction. Almost a year later, in April 2015, Carver "reengage[d]" his investigation of Clements. Carver sent Licona back out to Clements's trailer to obtain additional evidence and "to . . . secure more specific language to demonstrate that Mr. Clements knew that Mr. Licona was illegal."

On April 30, 2015, Licona made a recorded visit to Clements's trailer. Licona told Clements that: (1) he was "[t]rying to grab some bullets that I can buy," and; (2) he could not buy bullets from other people because, as he described it, "I was illegal." Upon disclosure of Licona's immigration status, defendant Clements did not ask Licona why he had not revealed this fact earlier. Clements also did not ask Licona to return the gun to Arnold. Rather, Clements continued with the discussion of ammunition, stating that Licona should have his wife buy him bullets.

Licona then asked defendant Clements if Arnold might have bullets for sale. Clements told Licona that he had not seen Arnold "in a minute." Licona asked if Clements would talk to Arnold about a possible sale of bullets. Clements

6

responded by asking Licona to provide his phone number for future contact. Clements also mentioned to Licona that he had already done "the hard part" by coordinating the purchase of the gun.

About a week later, on May 8, 2015, defendant Clements called Arnold and put Licona in touch with Arnold over the phone to discuss the sale of bullets. Prior to Licona coming on the line, Clements asked Arnold what price he would want for the bullets. Licona then came on the line. Licona spoke with Arnold, and the two agreed to meet at Clements's trailer later that day for a sale.

Later that day, Licona and Arnold met outside defendant Clements's trailer. At the beginning of their recorded meeting, Clements was inside his trailer. Licona asked Clements to come outside and waited until Clements was present before conducting the purchase. Licona later testified that he wanted Clements to be present at this meeting so that Clements could tell him "how much [to] pay" for the bullets.

With Clements now outside, Arnold produced a box of bullets and gave it to Clements for inspection. Clements "looked at" the box and handed it to Licona. The box was missing several bullets, but Licona accepted the box. Licona paid Arnold $20 to complete the purchase. Defendant Clements told Licona that he would "see if he could find [Licona] some more bullets."

7

## C.    Indictment and Trial

On July 8, 2015, a grand jury indicted Clements with, while aiding and abetting and being aided and abetted by others, knowingly selling a firearm to an illegal alien, in violation of 18 U.S.C. §§ 922(d) and 924(a)(2) ("count one"), and, while aiding and abetting and being aided and abetted by others, knowingly selling ammunition to an illegal alien, in violation of 18 U.S.C. §§ 922(d) and 924(a)(2) ("count two"). A three day jury trial ensued from January 4 to 6, 2016.

## D.    Licona's Immigration Status

During its case-in-chief, the government called DHS special agent David Chamberlin to testify about Licona's immigration status. Chamberlin had reviewed all of the DHS files on Licona. Chamberlin testified that: (1) Licona was an illegal alien even though he was first brought to DHS's attention in 2011, and; (2) Licona had not been brought before an immigration judge and had not otherwise received a designation of lawful status from the Attorney General. Notwithstanding, Chamberlin testified that Licona was designated as having a "special class deferred" status within the DHS. This meant that Licona had "been brought to the attention of the Department of Homeland Security, . . . specifically someone with immigration authority, [but] at this particular time DHS [was] not taking any action against that person for removal proceedings from the United States."

8

Upon hearing that Licona had received "special class deferred" status, government counsel asked Chamberlin whether this impacted Licona's status as an illegal alien. Chamberlin replied: "No. He has no status in the United States. At any given time, an immigration officer could go to him and put him back into removal proceedings."

Following Chamberlin's testimony, the parties agreed to a stipulation that Licona did not have deferred action status under the Deferred Action for Childhood Arrivals ("DACA") program. The district court read the stipulation to the jury, as follows:

> The parties agree and stipulate that the definition of deferred action read by Agent Chamberlin only applies to aliens who have applied for deferred action under Deferred Action for Childhood Arrivals, that is, DACA.
>
> There is further agreement and stipulation between the parties that there is no evidence that Jesus Licona applied for deferred action status under DACA. Furthermore, no other definition of deferred action can be found within the Department of Homeland Security web site.

Without objection, the district court also read the pattern jury instruction on the definition of an illegal alien, as follows:

> An alien is any person not a citizen or national of the United States.
>
> An alien is illegally or unlawfully in the United States if he is present in the United States after the expiration of the period of stay authorized by the United States Attorney General or is present in the

United States without being admitted or paroled into the United States by an appropriate governmental authority.

Reasonable cause to believe that someone is an alien then illegally or unlawfully in the United States means knowing facts that would cause a reasonable person to conclude that the other person is an alien then illegally or unlawfully in the United States.

## E.    Rule 29 Motion and Conviction

At the close of the government's case-in-chief, defendant Clements made an oral motion under Federal Rule of Criminal Procedure 29 for a judgment of acquittal. Clements argued that his motion should be granted on both counts because the government failed to establish all of the elements of the two offenses.

The district court granted defendant Clements's motion as to count one, finding that there was insufficient evidence to prove that Clements knew that Licona was an illegal alien at the time he coordinated the gun sale in 2014. However, prior to ruling on count two, the district court heard additional argument from the government. The government highlighted that Chamberlin reviewed Licona's immigration files and testified that: (1) Licona never received legal immigration status, and; (2) Licona's "special class deferred status" did not change his illegal status or the restrictions imposed on others for selling ammunition to him. The district court denied defendant Clements's motion for a judgment of acquittal as to count two.

10

The jury found defendant Clements guilty on count two. Clements timely filed this appeal.

## II. STANDARD OF REVIEW

This Court reviews "de novo a District Court's denial of judgment of acquittal on sufficiency of [the] evidence grounds, considering the evidence in the light most favorable to the Government, and drawing all reasonable inferences and credibility choices in the Government's favor." United States v. Capers, 708 F.3d 1286, 1296 (11th Cir. 2013). "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." United States v. Herrera, 931 F.2d 761, 762 (11th Cir. 1991). "The evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." United States v. Poole, 878 F.2d 1389, 1391 (11th Cir. 1989). Where "the government relies on circumstantial evidence, reasonable inferences, not mere speculation, must support the conviction." United States v. Mendez, 528 F.3d 811, 814 (11th Cir. 2008).

Arguments raised for the first time on appeal are reviewed for plain error. See United States v. Hunerlach, 197 F.3d 1059, 1068 (11th Cir. 1999) (concluding that plain error review applies to a sufficiency of the evidence argument when a

defendant moved for a judgment of acquittal on sufficiency of the evidence grounds, but failed to articulate the specific sufficiency of the evidence claim later raised on appeal). To demonstrate plain error, the defendant must show (1) an error, (2) that is plain, and (3) that affected his substantial rights. United States v. Turner, 474 F.3d 1265, 1276 (11th Cir. 2007). If the defendant satisfies these three conditions, we may exercise our discretion to recognize the error if that error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." Id. (quoting United States v. Vonn, 535 U.S. 55, 63, 122 S. Ct. 1043, 1048 (2002)).

### III. 18 U.S.C. § 922(d)

On appeal, Clements argues that: (1) Arnold, not Clements, sold the ammunition, and; (2) Clements did not know or have reason to know that Licona was an illegal alien. We review these arguments for plain error only, because Clements did not raise them before the district court. See Hunerlach, 197 F.3d at 1068.

### A.    Clements Knowingly Aided and Abetted the Sale of Ammunition to Licona

Under 18 U.S.C. § 922(d), it is unlawful for any person to sell any "firearm or ammunition to any person knowing or having reasonable cause to believe that

such person" either: (1) "is illegally or unlawfully in the United States," or; (2) "has been admitted to the United States under a nonimmigrant visa."[2] 18 U.S.C. § 922(d)(5).

A defendant who is indicted as a principal may be convicted on evidence showing only that he aided and abetted the offense. United States v. Iglesias, 915 F.2d 1524, 1528 (11th Cir. 1990); see also 18 U.S.C. § 2. In order to find that a defendant aided and abetted the offense under 18 U.S.C. § 2, the government must establish that the defendant "in some way associated himself with the criminal venture, that he wished to bring it about, and that he sought by his actions to make it succeed." United States v. Broadwell, 870 F.2d 594, 608 (11th Cir. 1989). A defendant may be convicted for aiding and abetting, even if he did not commit all of the acts that constitute the elements of the substantive offense, if: (1) someone committed the substantive crime; (2) the defendant contributed to and furthered that crime, and; (3) the defendant intended to aid in the commission of that crime. United States v. Sosa, 777 F.3d 1279, 1292 (11th Cir. 2015).

Here, the evidence showed that Arnold actually sold the ammunition to Licona. However, the evidence also sufficiently showed that Clements aided and abetted Arnold's sale. Clements took Licona's phone number after Licona asked

---

[2]This restriction is subject to certain exceptions for, among others, aliens admitted to the United States for purposes such as hunting or foreign relations. See 18 U.S.C. § 922(y)(2). These exceptions are not applicable to this case.

13

where he could get some ammunition and if Arnold had some. The day of the sale, Clements initiated the phone call to Arnold, and before Licona came on the line, Clements asked Arnold what price Arnold wanted for the ammunition. Later, at the trailer, Clements handled the box of ammunition Arnold brought and examined it before ultimately giving it to Licona. Clements also remarked to Licona that he would see if he could find more ammunition for Licona to purchase. Clements's indictment charged him under an aiding and abetting theory, but, even if it had not, he could still be convicted based on evidence showing that he merely aided and abetted the offense. See Iglesias, 915 F.2d at 1528. Therefore, there is no error as to this element, much less plain error.

The evidence is also sufficient to show that Clements knew or had reason to know that Licona was an illegal alien, as Licona informed him of his illegal status prior to the ammunition sale. Consequently, in this regard, there is also no error, much less plain error.

**B.    Licona's Illegal Status**

Clements also argues that Licona was given "special class deferred status" and thus was lawfully in the United States at the time of the sale. We review this argument de novo, as Clements raised this argument during trial. Capers, 708 F.3d at 1296.

Clements does not dispute that Licona entered the United States illegally. Clements also does not object to the district court's pattern jury instruction on the definition of an illegal alien, which described an illegal alien as someone "present in the United States without being admitted or paroled into the United States by an appropriate governmental authority."

Rather, Clements argues that Licona's "special class deferred status" granted him lawful immigration status in the United States. However, the record evidence shows otherwise. Specifically, DHS special agent Chamberlin reviewed Licona's immigration file and expressly testified that Licona's "special class deferred status" did not change his designation as an illegal alien. This meant only that DHS was not starting removal proceedings against Licona but that, at any given time, an immigration officer could put Licona into removal proceedings. See Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471, 483-84, 119 S. Ct. 936, 943-44 (1999) (explaining that deferred action is a discretionary decision by immigration authorities in the executive branch, developed without express statutory authorization, to decline to institute, continue, or execute the removal of an "apparently deportable" alien). There is no evidence that Licona was legally admitted or paroled into the United States. Accordingly, sufficient evidence supports the finding that Licona was, in fact, an illegal alien when Clements aided and abetted the sale of ammunition to him.

15

## III. CONCLUSION

For all of these reasons, we affirm Clements's conviction and sentence.

**AFFIRMED.**