[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-13232

_____

D.C. Docket No. 1:12-cr-20771-RSR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

NATOYA MASHEA HANDY,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 30, 2015)

Before HULL, JULIE CARNES and WALKER[*], Circuit Judges.

PER CURIAM:

_____

[*]Honorable John M. Walker, Jr., United States Circuit Judge for the Second Circuit,
sitting by designation.

After a jury trial, Natoya Mashea Handy appeals her convictions and total sentence of 51 months' imprisonment and a $7,000 fine for one count of possessing 15 or more unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), and five counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A(a)(1).  After careful review of the entire record, and with the benefit of oral argument, we affirm Handy's convictions and sentences.

## I.  TRAFFIC STOP AND SEIZURE OF EVIDENCE

This case involves the April 5, 2012 traffic stop of defendant Handy by City of Miami Gardens police officers.  Handy was driving a rental car which the officers impounded and searched.  The evidence obtained during the inventory search eventually formed the basis of the federal prosecution in this case.  We base our description on the evidence presented at trial, as well as testimony given during a pretrial suppression hearing.[1]  We highlight the conflicting evidence regarding certain facts.

**A.    The Traffic Stop**

On April 5, 2012, then-Detective William Wagenmann[2] of the City of Miami Gardens Police Department ("Police Department") was conducting

---

[1]In considering the denial of a motion to suppress, we may consider both the evidence presented at the suppression hearing and the evidence presented at trial.  United States v. Villabona-Garnica, 63 F.3d 1051, 1056 (11th Cir. 1995).

[2]Wagenmann was a detective at the time of the traffic stop but had been promoted to the rank of sergeant by the time of the suppression hearing and trial in this case.

2

surveillance as part of a robbery-prevention detail.  Detective Wagenmann observed a silver Chevrolet Impala, driven by defendant Handy, with a Georgia license plate and heavily tinted windows circling the surveillance area.  The windows of the Impala were so darkly tinted that Detective Wagenmann "couldn't see anything inside."  The darkly tinted windows violated a Florida law that limited window tinting to a level at which a vehicle's occupants would be visible.

The out-of-state license plate and illegally tinted windows prompted Detective Wagenmann to run the Impala's license plate, and he thereby learned that the Impala was a rental.  In Detective Wagenmann's experience, the perpetrators of a number of past Miami Gardens robberies and burglaries had used rental cars with heavily tinted windows or out-of-state plates.  Therefore, Detective Wagenmann contacted the other members of the surveillance team and alerted them to the Impala's presence.

Detective Cheri Nettles, another member of the surveillance team, spotted the Impala and started following it, after which it sped up and continued erratically circling the area.  Detective Nettles then initiated a traffic stop of the Impala.

As Handy and Detective Nettles were stopping their respective vehicles, Detective Wagenmann pulled up behind Detective Nettles's vehicle.  Once on foot, Detective Nettles approached the driver's side of the Impala, while Detective Wagenmann approached the passenger side.  Detective Nettles asked for Handy's

3

driver's license and registration, and Handy produced her driver's license and informed Nettles that the Impala was a rental.  Detective Wagenmann requested Handy's permission to search the Impala, but she declined.

Detective Wagenmann subsequently moved to the driver's side of the Impala and asked Handy about the dark tint on the windows.  Handy replied that she was an entertainer and did not want to be recognized in her car, so she had dark tint applied to the windows.[3]  Handy claimed to be in the area visiting a friend, but she was unable to provide an address, a location, or even an area where the friend lived.

Handy provided Detective Wagenmann with a copy of the rental contract for the Impala, and in reviewing the contract, he learned that the car was about a week overdue, as the rental contract was only for a single day: March 26 to March 27, 2012.  When Detective Wagenmann asked Handy about the expired rental agreement, Handy advised him that she had contacted the rental company, Advantage Rent-a-Car ("Advantage"), and had extended the rental over the phone.

## B.    Detective Wagenmann's Conversation with Advantage

In order to verify the rental contract for the Impala, Detective Wagenmann then called Advantage using a toll-free number and spoke with "Heath" in

---

[3]Subsequently, Detective Wagenmann measured the tint of one of the Impala's windows, confirmed that the window illegally permitted visible light penetration at a rate of only 4 percent, and issued Handy a citation for illegal tint.

Roadside Assistance.  Heath checked Advantage's records and advised Detective Wagenmann that the Impala was overdue and that Advantage had made numerous unsuccessful attempts to contact Handy to have it returned.[4]  Heath further stated that no one had contacted Advantage to extend the rental and requested that Detective Wagenmann impound the vehicle so that Advantage could retrieve it.[5]  At the suppression hearing, Detective Wagenmann testified that, to the best of his recollection, he never told Heath that he suspected the car was involved in a crime or that he wished to tow the car for that reason.

Heath's notes in Advantage's computer records confirm Detective Wagenmann's call, stating that Wagenmann "adv[ised that] he has [the Impala] pulled over."  However, in contrast to Detective Wagenmann's testimony that he never told Heath that he suspected the Impala had been used in a crime, the notes state that, according to Wagenmann, the Impala "is under suspicion of being used in a crime and contract overdue" but that the "renter claims she's already extended it."  Under "Resolution Description," Heath noted that he "adv[ised] Det[ective] [Wagenmann] I don't show it [to] be extended and called . . . [the manager on duty] who adv[ised] he's been trying to contact cust[omer] to extend it but she

---

[4]Testimony also established that, according to Advantage records, Advantage had attempted multiple times to get credit card authorization for additional charges incurred while the Impala was overdue, but Handy's credit card was denied each time.

[5]The arrest affidavit prepared by Detective Wagenmann avers that the Advantage representative "advised that the car was overdue, and [the representative] wanted it returned. [Handy] was advised that the car was being impounded at the request of the rental car company."

doesn't answer her phone.  Det[ective] [Wagenmann] adv[ised] he's going to impound the veh[icle]."

The "manager on duty" referenced in Heath's notes was John Scott, the manager for the local Advantage location from which Handy had rented the Impala.  The record indicates that, while on the phone with Detective Wagenmann, Heath twice placed Wagenmann on hold to speak with Scott on another line.

At the suppression hearing, Scott testified for the defense that, when he and Heath initially spoke, Heath told him that Handy had been stopped by the police and was claiming that her rental contract had been extended and that Heath wished to verify whether the contract had been extended.  Scott confirmed that the Impala was overdue but advised Heath to speak directly to Handy and ask her permission to run her credit card to "bring the account up to current," assuming the card had sufficient funds.

However, Heath placed Scott on hold and, after he came back on the line, "[Heath] said the car—the officer said the car—he is want[ing] to take the vehicle because the vehicle had been involved [in] crimes."  Scott testified that, according to Heath, it was the police officer who wanted the car towed.  At that point, because "the car was being involved in a crime, [pursuant to the] company's policy, [Scott] gave the okay to take the vehicle."  Scott and Detective Wagenmann never spoke directly.

6

### C.    Advantage's Policies on Overdue Rentals

At the suppression hearing, William Kinnebrew, a corporate security manager for Hertz Corporation, which owned Advantage at all relevant times, testified about Advantage's policies on overdue rentals.  Kinnebrew testified that Advantage's normal policy when contacted by police about an overdue rental car is to effectuate repossession of the car either by having the police impound it or sending a tow truck to retrieve it.

In contrast, Scott, Advantage's manager on duty, testified that his normal practice was to wait 60 days before referring an overdue rental to Advantage's security department for repossession efforts.  According to Scott, Advantage did not have a general policy of requesting a rental be towed anytime a police officer called, and he had at least one experience in which he extended a rental contract over the phone with a customer after the police had called.

Scott further testified that, as to Handy in particular, she had rented vehicles from Advantage on a regular basis over a period of one to two years, and that she previously had failed to return a rental car when the contract expired.  However, in such instances, Advantage would contact her concerning the expired contract and "most of the time . . . would be able to reach her after a while[,] and she would come in, close it out, pay."  Scott could not recall a time when Handy ever failed to pay for a rental.

7

**D.      The Impoundment of the Impala and the Police Department's Policy on Impounded Vehicles**

Returning to the events of April 5, 2012, Detective Wagenmann—after speaking with Heath at Advantage—advised Handy of Advantage's statement that the rental contract had not been extended, that Advantage wanted to retrieve the car, and that the police would be impounding the car.  Handy became argumentative, stating that she had rented the car, that it was hers, and that Detective Wagenmann could not take it.

Because Detective Wagenmann was impounding the Impala, he conducted an inventory search of the car, pursuant to the Police Department's Policy Manual on Towing Vehicles, Vessels, and Aircraft ("Policy Manual").  This inventory search was primarily to protect the Police Department from liability for any items that may later be claimed missing from the car and to ensure that the car contained no weapons that would be taken to the impound yard.

The Policy Manual, which was entered into evidence at the suppression hearing, provided that it was the Police Department's policy "to safeguard and properly document the contents of . . . towed conveyances."  The Policy Manual directed any employee requesting a tow to do so via "the Communications Center" and to provide certain information, including whether the tow was "[p]olice directed or [pursuant to a] private request."  The Policy Manual also stated, in Section D.2, entitled "Vehicle, Vessel or Aircraft Inventories":

8

In the course of duty on a day-to-day basis, it is necessary for the protection of the employee and the Department to inventory vehicles, vessels or aircraft being towed and/or stored.  Vehicles, vessels or aircraft which are towed as a result of an accident, abandonment, seizure, incident to an arrest, or otherwise detained in storage, and not in the possession of the owner, become the responsibility of the impounding employee.  The employee is liable for the vehicle, vessel or aircraft [and] its parts and contents.  The contents of the vehicle, vessel or aircraft include, but are not limited to, all packages and containers located within the passenger compartment, the trunk, or any other secured area of the vehicle (i.e., glove box, console, under seat, etc.)  To insure that liability does not attach for property located within any vehicle, vessel or aircraft or any package/container, the contents of said vehicle or package/container, whether locked, opened or closed, shall be ascertained and inventoried.

Detective Wagenmann testified that his normal procedure was to search and inventory any vehicle that was being towed, even if it was being impounded at the request of a private party and not for criminal conduct.[6]  He also testified that it was the policy of the Police Department to have overdue rental cars towed for rental companies, and that the police officers effectuated such tows "[a]ll the time."

E.    **The Inventory Search**

During the inventory search of the Impala, Detective Wagenmann found, on the front passenger seat, a cell phone and charger, the packaging for a rechargeable Green Dot debit card, three photocopies of a Florida identification card for "Willie

---

[6]In contrast, Detective Miguel Irizarry of the Police Department, who was called to testify concerning the Policy Manual, testified on cross-examination that he would not search and inventory a vehicle that he was having towed at the request of a private individual or company in the absence of an arrest of the driver or probable cause of a crime.

Donnell," two Wells Fargo bank statements addressed to Donnell, a checkbook, and a package of blank 1099 tax envelopes.[7] Detective Wagenmann removed these items from the Impala and moved them to Detective Nettles's car, where Handy was waiting. As Detective Wagenmann did so, Handy explained that "she was helping her aunt[, Willie Donnell,] clear up a banking issue, and that's why she had those items in the vehicle."

Detective Wagenmann then returned to the Impala and began searching the rear passenger area, where he found an Apple laptop computer and charger. He opened the lid of the laptop to check whether the screen had any damage, and the screen lit up and revealed an open Adobe file with a tax return for "Reynardo Britt." Handy told Detective Wagenmann that the laptop was hers.

Detective Wagenmann next inventoried the items in the trunk of the car, which included clothing and a large, black backpack that contained about $2,960 in cash, an HP laptop, a red G-Shock watch, an iPod Nano, deodorant, skin lotion, soaps, cell phone chargers, a hairbrush, and some boxes of prescriptions in the name of "Rochelle Majors." Handy claimed ownership of the backpack, cash, HP laptop, watch, and iPod, and stated that a friend of hers had given her the prescription to treat her eczema.

---

[7]At trial, Sergeant Wagenmann testified that Green Dot debit cards are commonly used by the government to distribute income tax refunds, and that the cards are often used for fraud. He also explained that the 1099 envelopes are used by employers to provide statements showing what they had paid to independent contractors during the tax year.

10

The backpack also contained some tax documents and forms; pieces of mail in various persons' names; checks written by Handy; checks written to Handy; a motor vehicle registration; credit card payment envelopes; bank statements in other people's names; and other financial documents.  Specifically, the mail included pieces addressed to "Genia Bennett," Handy's uncle; a PayPal card for Donnell; another letter from Wells Fargo to Donnell; correspondence addressed to "Constance Wood"; a tax document sent to "Shauna Gibson"; a W-2 form for "Anthony Randell"; a tax document for "Erica Smith"; a letter from the Department of Treasury to "IME, Inc.," a company that Handy claimed to own; and letters from Capital One, Credit One Bank, and Chase Bank addressed to Handy.  As Detective Wagenmann removed these items and inventoried them in front of Handy, she claimed ownership of any paperwork bearing her name but denied any knowledge of the documents bearing other individuals' names.

Detective Wagenmann found the backpack to further contain chargers and cords for the laptops; three cell phones; a SanDisk flash card; traffic citations; boarding passes; numerous credit cards in the names of Donnell, Handy, and "N Finance"; bank receipts for deposits and withdrawals; and a variety of receipts, including from Walgreens and National Rent-a-Car.  Handy claimed that the cell phones were old phones that she no longer used and that the cell phone in the front seat was her current phone.  As to the credit cards, Handy said that N Finance was

11

another company that she owned, and she claimed ownership of any of the credit cards bearing N Finance's name. Handy stated that the cards in Donnell's name were related to the banking issue she was attempting to clear up for Donnell. Detective Wagenmann also found several rechargeable debit cards that did not bear any name, and Handy denied any knowledge of these cards.

Finally, Detective Wagenmann also found in the backpack two red, spiral-bound notebooks. When he removed the notebooks, multiple loose pages fell out that contained lists of names, dates of birth, and social security numbers. One of the loose pages alone contained a list of 68 names, dates of birth, races, and social security numbers. The pages of the notebooks also contained lists of credit card account numbers, expiration dates, security codes, bank account numbers, bank routing numbers, and personal identification numbers, and personal information about Rochelle Majors, including an address in Oklahoma. Handy denied any knowledge of the notebooks or the pages contained in them.

As Detective Wagenmann inventoried the items from the Impala, he began to suspect that fraud was involved, so he contacted the Police Department's fraud detective to respond to the scene. Detective Wagenmann eventually contacted federal authorities and handed over investigation of the case.

## II.  PRETRIAL PROCEEDINGS

We now turn to the procedural history in this case, including Handy's not-guilty plea, the district court's denial of Handy's pretrial suppression motion, and Handy's jury trial.

### A.    Indictment and Not Guilty Plea

In October 2012, a federal grand jury indicted Handy on one count of possessing 15 or more unauthorized access devices, specifically social security numbers, and five counts of aggravated identity theft.  That same month, Assistant Federal Public Defender Patrick Hunt was appointed to represent Handy, and she entered pleas of not guilty to all of the charges.

### B.    Handy's Suppression Motion

In December 2012, Handy filed a motion to suppress any evidence seized by law enforcement on April 5, 2012, as well as any statements attributed to her on that date.  Handy requested an evidentiary hearing and argued that the burden was on the government to show that an exception to the warrant requirement existed to justify its warrantless search of the Impala.

### C.    Evidentiary Hearing and Denial of Suppression Motion

After the government responded in opposition to the suppression motion, the district court conducted an evidentiary hearing on January 10 and 14, 2013.  During that hearing, Detective Wagenmann testified for the government,

13

describing the events of April 5, 2012, as recounted above. The government also called Kinnebrew to testify, and the defense called Scott to testify.

On January 15, 2013, the district court issued an order denying Handy's motion to suppress. The district court found that the search of the Impala fell within the inventory-search exception to the Fourth Amendment's warrant requirement because the Police Department's policy on inventories of impounded or towed cars left no room for discretion and applied to both police-directed and privately requested tows. Finding Detective Wagenmann to be credible, the district court rejected Handy's argument that Detective Wagenmann had decided on his own, absent instruction from Advantage, to impound the Impala as pretext for searching the car. The district court specifically made a factual finding that, after Advantage's Heath told Wagenmann that Handy had not contacted Advantage to extend her rental of the Impala, "Detective Wagenmann asked whether Advantage wanted the car impounded, and Heath replied that it did. Accordingly, Detective Wagenmann informed Heath that he would impound the car."

## D. Defense Requests for Continuances and Motion for Substitution of Counsel

After the ruling in the suppression hearing, Handy's case was reassigned within the Federal Public Defender's Office from Patrick Hunt, who left the office, to Assistant Federal Public Defender Chantel Doakes. At a calendar call on

14

January 24, 2013, Handy requested a one-week continuance to retain private counsel. The district court granted the request and set the matter for a calendar call on January 30, 2013.

At the January 30, 2013, calendar call, Handy had yet to retain private counsel, so the district court granted her request to continue the trial from February 11, 2013, to April 1, 2013, so that Handy could retain private counsel.

On March 22, 2013, Assistant Federal Public Defender Doakes filed a motion for determination of counsel, requesting a hearing to determine whether new counsel should be appointed. Doakes reported that, the day before, Handy had "expressed an absence of trust and confidence in defense counsel and advised . . . that she wants a new lawyer appointed to represent her in this matter."

On March 26, 2013, Handy filed pro se a motion to remove appointed counsel, alleging a significant breakdown in communication and refusal on the part of counsel to investigate or file meritorious motions to exclude evidence. Handy claimed that attorney Doakes had shown a "persistent refusal to let [her] explain facts critical to [her] defense, won't explain strategic decisions or seek input. The attorney client relationship has deteriorated so that the two parties cannot effectively communicate." Additionally, Handy alleged, "[attorney] Doakes has not displayed any concern for my better interest in the case, and has continuously

15

stated that I needed to take a plea bargain, before looking at physical evidence, researching facts, or going through a possible defense for the defendant."

### E.    Hearing on March 27, 2013

The district court held a hearing on the motions on March 27, 2013, at which Handy addressed the court and generally repeated her allegations that Assistant Federal Public Defender Doakes had refused to review the evidence in her case or develop a defense.

Attorney Doakes explained to the district court that, after refusing a conditional plea negotiated with the government by attorney Hunt, Handy had insisted from the time of the January 24 calendar call that she would be retaining private counsel.  Moreover, even after Handy told attorney Doakes on March 7 that Handy would "stay with [the Public Defender's] office," Handy refused to provide assistance to either Doakes or Doakes's investigator for trial preparation and instead continued to focus on the unsuccessful motion to suppress.

The district court found that Handy's allegations concerning attorney Doakes were not credible, that Handy had not been cooperating with Doakes, that nothing Handy said indicated that Doakes was not doing her job properly, and that Handy simply was trying to delay the trial.  The district court told Handy, "I am not going to give you another attorney.  You need to work with the attorney that you have."

The district court then held a calendar call for Handy's case, and the government stated that it had provided defense counsel oral notice that it intended to introduce evidence of Handy's unauthorized possession of credit cards. Specifically, the evidence included the credit cards in Willie Donnell's name found in the Impala and testimony by Donnell that she had not authorized Handy to possess the credit cards and that Handy always carried around a black bag that Handy called her "money bag." In a written notice filed later that day, the government argued that the evidence was admissible either because (1) it was not extrinsic to—and instead was inextricably intertwined with the other evidence of— the charged offenses; or (2) it was admissible under Federal Rule of Evidence 404(b)(2) to demonstrate Handy's knowing possession of the black backpack and its contents and her intent to defraud.

In light of this evidence, Handy's defense counsel requested, and the district court granted, a one-week continuance of the trial to April 10, 2013. On April 4, 2013, privately retained counsel entered a notice of appearance on behalf of Handy.

## III.  TRIAL, CONVICTIONS, AND SENTENCING

### A.    Jury Trial

During the two-day jury trial, Detective Wagenmann testified for the government as to the above-described evidence found in the Impala during the

17

inventory search.  Detective Wagenmann also testified about Handy's statements disclaiming ownership or knowledge of many of the items.  For example, Detective Wagenmann explained that Handy generally claimed ownership of "anything innocuous or non-incriminating" but denied knowledge of any "fraud-related item" that contained someone else's name.

Willie Donnell, Handy's great aunt, testified that Handy was living with her as of April 5, 2012.  However, Donnell never gave Handy permission to have copies of her Florida identification card, letters to her from Wells Fargo, or credit cards in her name, and never asked Handy to help her clear up an issue with her bank.  When shown the credit cards in her name found in the Impala, Donnell testified that she had never before seen, or applied for, the cards.[8]

Additionally, evidence was introduced concerning 17 of the 68 individuals who were listed, along with their dates of birth and social security numbers, in one of the notebooks found in Handy's backpack.  The evidence established that, although the 17 individuals all were incarcerated throughout 2011 and did not earn any wages that year, 2011 federal income tax returns for all 17 individuals were filed claiming refunds of several thousand dollars each.  The returns also represented that the individuals had earned wages in 2011.  All 17 returns had been

---

[8]Handy did not object to this testimony by Donnell.  Additionally, during the charge conference, when the district court proposed omitting a Federal Rule of Evidence 404(b) limiting instruction as not applicable, Handy stated that she had no objection.

filed electronically, and several of the 17 returns were filed on the same day. The Internal Revenue Service ("IRS") was reviewing or questioning at least one of the returns, which can occur when the withholding is disproportionate to the stated income.[9]

The returns included that of Crystal Lambert, who testified that she was incarcerated in Hernando Prison from 2008 to 2012. Although a 2011 tax return for Lambert was filed claiming a refund of $9,872, Lambert testified that she did not receive any wages from her prison job in 2011; she neither filed a tax return for 2011 nor authorized anyone to file a return on her behalf; she did not receive a tax refund for 2011 from the IRS; and she did not recognize the address listed on the return filed under her name. Moreover, Lambert did not recognize Handy and did not know anyone with Handy's name.

## B.    Motion for Judgment of Acquittal and Verdicts

At the close of the government's case, Handy's counsel moved orally for judgment of acquittal, stating that the government had "failed to prove a prima facie case that [Handy] was in possession of these Social Security numbers as well as committed the crimes of aggravated identity theft." Handy declined to offer further argument on the motion, and the district court denied the motion.

The jury found Handy guilty of all charges in the indictment.

---

[9]Testimony established that the IRS uses the social security number provided with an income tax return to verify the identity of the taxpayer.

## C.    Sentencing

The presentence investigation report ("PSI") recommended a base offense level of six for Count One, the count of possessing 15 or more access devices, pursuant to U.S.S.G. § 2B1.1(a)(2).  The PSI added to that base offense level: (1) a six-level increase because the loss amount was between $30,000 and $70,000, pursuant to § 2B1.1(b)(1)(D); and (2) a four-level increase because the offense involved more than 50 but fewer than 250 victims, pursuant to § 2B1.1(b)(2)(B).  As to the number of victims, the PSI noted that the inventory search of the Impala revealed "a total of 73 Social Security numbers of relatives, incarcerated or formerly incarcerated persons which defendant had in her possession.  The investigation continues as to the numerous ways the identifiers were fraudulently used in various schemes.  The government has been unable to pinpoint the defendant's exact involvement in these schemes."

Handy's total adjusted offense level was 16.  Based on this total offense level and criminal history category of I, Handy's advisory guidelines range for Count One was 21 to 27 months' imprisonment.  Additionally, Counts Two through Six, the aggravated identity theft counts, each carried a statutory two-year term of imprisonment, to run consecutive to any other term of imprisonment, pursuant to 18 U.S.C. § 1028A(a)(1), (b)(2).

The PSI further recommended a guidelines fine range of $5,000 to $50,000, based on an offense level of 16, pursuant to U.S.S.G. § 5E1.2(c)(3), and noted that the statutory maximum fine was $250,000, pursuant to 18 U.S.C. § 3571(b)(3). As to whether a fine should be assessed, the PSI concluded that Handy had provided insufficient information for the probation officer to make such a recommendation. In particular, Handy had refused to sign any financial release forms and had provided only limited financial information.

Through an independent investigation, the probation officer was able to verify the following about Handy's financial situation: (1) she had two Wells Fargo accounts, each with a $100 balance; (2) she owned a 2002 Cadillac Escalade with an estimated value of between $6,340 and $10,070; (3) she had $2,000 in credit card debt; and (4) she had no dependents. However, the probation officer was unable to verify the following financial information reported by Handy: (1) since 2009, she owned a business as a producer, rap artist, singer, and event promoter, and earned between $70,000 and $100,000 annually; (2) from 2003 to 2006, she worked with a music group, earning between $40,000 and $150,000 annually; and (3) she had no business assets.

Handy filed no objections to the PSI.

At the sentencing hearing, after confirming that the parties had no objections to the PSI, the district court adopted the factual statements and guideline

21

calculations contained in the PSI.  Before imposing a sentence, the district court questioned Handy about her lack of cooperation in providing the probation officer with financial information.

Handy's counsel stated that he had not properly advised Handy that the probation officer would be visiting her in jail to question her concerning her financial situation and that she needed to cooperate and be candid and forthcoming. Moreover, defense counsel represented, Handy would more than likely be declared indigent for purposes of her appeal and did not "have any funds in an offshore account or anything like that."

Handy addressed the district court and stated that she was "hesitant to cooperate" with the probation officer or sign a financial release form because she "didn't know what it was or who [the probation officer] really was," as her attorney had not advised her that the probation officer would be visiting the jail. She also asked the district court for leniency in her sentence, repeatedly professing her innocence and denying that she had committed any crimes.

The district court sentenced Handy to a total 51-month sentence of imprisonment, consisting of 27 months on Count One, followed by concurrent sentences of 24 months on Counts Two through Six.  In imposing the sentence, the district court stated that it had considered the advisory guidelines range and all of the 18 U.S.C. § 3553(a) factors, but it specifically discussed the nature of the

offenses, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offenses and afford adequate deterrence.

As to these factors, the district court noted the "real identity fraud/identity theft problem here in the Southern District of Florida"; the years it takes for victims to "clear up" the issues caused by identify theft; and Handy's continued insistence that she was innocent despite overwhelming evidence presented at trial of her guilt. The district court additionally noted that it had considered imposing additional consecutive terms of imprisonment for Counts Two through Six but decided against it because "51 months is enough but not more than required to accomplish the purposes that Section 3553(a) wants for courts to try to accomplish with a sentence."

> The district court also imposed a $7,000 fine, stating:

> I know that she is sitting here right now and saying that she didn't know that the probation officer was coming. But I expressly explained this to Ms. Handy after the verdict came back with the jury, and I asked her if she would cooperate and be truthful, and she said that she would, and she did not. So, again, I don't think that that should inure to her benefit.

> You know, the [PSI], I guess, maybe some might consider that because it doesn't have a finding with respect to how much money she has available to her, that the inference should be drawn to her benefit. But I disagree. I don't think she should benefit from failing to cooperate, especially when she was earning $70,000 to $100,000 in the years before this occurred.

And, so, I am going to impose a fine and I'm going to impose a fine of ten percent of what she had been earning in the years before in one year, which would be $7,000.[10]

Following the imposition of sentence, Handy herself summarily objected, stating her belief that that "the book [was] being thrown at [her] . . . because . . . [she] didn't speak to or [she] declined to sign documents from a probation officer." The district court explained that "the sentence is not imposed because you did not speak with the probation officer.  That's why the $7,000 fine is imposed, because I have no way of ascertaining what your financial means are and I'm not going to allow you to work that to your benefit.  The sentence is imposed [on] behalf of the harm that you inflicted on the victims by engaging in this crime . . . ."  The district court inquired whether any of the parties had any legal objections, and defense counsel and the government responded in the negative.

Handy timely appealed.

## IV.  MOTION TO SUPPRESS

On appeal, defendant Handy contends that the district court erred in denying her motion to suppress because, first, the court clearly erred in finding that Detective Wagenmann had the authority to impound the Impala, and second,

---

[10]Although the district court's instructions to Handy to cooperate with the probation officer are not in the record, the government's attorney also represented at sentencing that, "prior to . . . recessing in this matter following the trial, [the district court] did advise the defendant of how the presentence investigation report would proceed, how that process would work, and the Court advised the defendant here in open court to be cooperative with the probation officer."

24

Detective Wagenmann's decision to impound and inventory the contents of the Impala was not adequately guided by Police Department policies.

## A.    Standard of Review

In reviewing the district court's denial of a motion to suppress, we review the court's findings of fact for clear error and its application of law to those facts de novo. United States v. Yeary, 740 F.3d 569, 579 n.25 (11th Cir. 2014). We construe all facts in the light most favorable to the party that prevailed in the district court and afford substantial deference to a factfinder's credibility determinations. United States v. Lewis, 674 F.3d 1298, 1303 (11th Cir. 2012). We accept the factfinder's choice of whom to believe "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it." United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002) (quotation omitted). Thus, we defer to the district court's factual determinations unless the district court's understanding of the facts is "unbelievable." Id. (quotation omitted).

## B.    Inventory Searches

The Supreme Court has held that inventory searches of legally impounded vehicles, conducted pursuant to an established procedure but without a warrant, are reasonable under the Fourth Amendment. South Dakota v. Opperman, 428 U.S. 364, 372, 96 S. Ct. 3092, 3098-99 (1976). The Supreme Court identified three

25

distinct interests that justify the inventory search of a car upon impoundment: (1) the protection of the owner's property while it remains in police custody; (2) the protection the police against claims or disputes over lost or stolen property; and (3) the protection of the police from potential danger. Id. at 369, 96 S. Ct. at 3097. Because an inventory search is an exception to the Fourth Amendment's warrant requirement, the government has the burden of showing that the requirements of the inventory search exception have been met. Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992) (Bivens action Fourth Amendment claim).

Because an "inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence," the Supreme Court has held that "[t]he individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime." Florida v. Wells, 495 U.S. 1, 4, 110 S. Ct. 1632, 1635 (1990) (quotation omitted). Thus, "standardized criteria or established routine must regulate the opening of containers found during inventory searches." Id. (citations omitted). Although it is not the only permissible policy, a policy of "opening all containers

26

. . . [is] unquestionably permissible." Id. Moreover, "[t]he policy or practice governing inventory searches should be designed to produce an inventory." Id.[11]

Further, the validity of an inventory search of a car depends on the legality of the decision to impound the car. See Sammons, 967 F.2d at 1543 ("If [a] vehicle has been lawfully impounded, the law enforcement officer may conduct an inventory search, including a search of closed containers, provided the search is conducted pursuant to standardized criteria."). The Supreme Court has explained that a police officer's decision to impound a car may involve discretion but must be made according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity. See Colorado v. Bertine, 479 U.S. 367, 375, 107 S. Ct. 738, 743 (1987). "'[T]he critical question . . . is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason.'" Sammons, 967 F.2d at 1543 (quoting United States v. Rodriguez-Morales, 929 F.2d 780, 786 (1st Cir. 1991)).

After reviewing the evidentiary record, we cannot say that the district court erred in denying Handy's motion to suppress. As an initial matter, viewing the

[11]Additionally, "the scope of an inventory search may not exceed that necessary to accomplish the ends of the inventory." United States v. Khoury, 901 F.2d 948, 958 (11th Cir.), modified on other grounds on denial of reh'g, 910 F.2d 713 (11th Cir. 1990). Here, Handy challenges Detective Wagenmann's decision to perform an inventory search and his authority to do so, but not the scope of the search he performed.

27

evidence in the light most favorable to the government, Detective Wagenmann's decision to impound the Impala was both based on established Police Department procedure and reasonable under the Fourth Amendment.  See Opperman, 428 U.S. at 372, 96 S. Ct. at 3098-99.  As to Police Department procedure, Detective Wagenmann's uncontroverted testimony demonstrated that it was the common practice of the Police Department to impound overdue rental cars at the request of rental companies.  Moreover, the Police Department Policy Manual plainly envisioned that police officers would impound some cars at the request of private parties, as it requires police officers requesting a tow to state whether the tow is "[p]olice directed or [based on a] private request."

As to reasonableness, Detective Wagenmann's decision to impound the Impala was "within the realm of reason" under the circumstances of this case.  See Sammons, 967 F.2d at 1543.  In particular, Advantage, the Impala's rightful owner, had requested that Detective Wagenmann impound the car; Handy had no continuing legitimate claim on the car because the rental contract had expired; Handy's credit card repeatedly had been declined for additional charges; and Handy had altered the car with illegal window tinting.  Thus, in light of these facts, Detective Wagenmann reasonably exercised his discretion to impound the Impala based on established Police Department practice.  See Bertine, 479 U.S. at 375, 107 S. Ct. at 743.

28

We reject Handy's argument that the district court clearly erred in finding that Detective Wagenmann impounded the Impala at the request of Advantage and not as pretext for searching the car based on suspicion of criminal activity. The district court expressly found Detective Wagenmann to be credible. Contrary to Handy's suggestion, nothing in Heath's notes contradicts Detective Wagenmann's testimony that Advantage, and not Wagenmann, requested that the Impala be impounded. The statement in Heath's notes that "Det[ective Wagenmann] adv[ised] he's going to impound the veh[icle]" does not necessarily imply that Wagenmann was impounding the Impala upon his own initiative and not in response to Heath's request. And even if Detective Wagenmann misremembered that he told Heath that he suspected that the Impala had been involved in a crime, this did not render his testimony inconsistent or improbable on its face.

Moreover, although Advantage manager Scott testified that he wished for Heath to try to "bring the account up to current" by speaking to Handy and that Heath said that "it was the police officer who wanted the car towed," Scott neither spoke directly with Detective Wagenmann nor heard Heath's conversation with Wagenmann. And even if Scott's own normal practice was to allow overdue renters to extend their contracts, security manager Kinnebrew's uncontroverted testimony established that Advantage's corporate policy, at the very least, permitted requesting the repossession of overdue rental cars when contacted by

29

police.  In sum, the district court's finding that Advantage requested the impoundment is supported by evidence in this record, and we must defer to this finding of fact.  See Ramirez-Chilel, 289 F.3d at 749.

We also conclude that, to the extent that Detective Wagenmann lawfully impounded the Impala, he permissibly could conduct an inventory search of the car, including a search of closed containers, according to standardized criteria.  See Sammons, 967 F.2d at 1543.  Here, Detective Wagenmann's inventory search was guided both by standardized criteria provided in the Policy Manual and established Police Department routine.  See Wells, 495 U.S. at 4, 110 S. Ct. at 1635.

Specifically, the Policy Manual clearly covered all towed conveyances, stating that it was the Police Department's policy "to safeguard and properly document the contents of . . . towed conveyances."  Additionally, the Policy Manual stated, "[t]o insure that liability does not attach for property located within any vehicle, vessel or aircraft or any package/container, the contents of said vehicle or package/container, whether locked, opened or closed, shall be ascertained and inventoried" (emphasis added).  As the Supreme Court has stated, a policy of "opening all containers . . . [is] unquestionably permissible."  Wells, 495 U.S. at 4, 110 S. Ct. at 1635.  Detective Wagenmann's testimony also indicated that it was normal Police Department procedure to search and inventory

any vehicle that was being towed, even if it was being impounded at the request of a private party and not for criminal conduct.

## V.  SUFFICIENCY OF THE EVIDENCE

On appeal, defendant Handy argues that the district court erred in denying her motion for judgment of acquittal because the evidence was insufficient to support her convictions.  As discussed below, Handy's arguments lack merit.

### A.    Standard of Review

Ordinarily, we review de novo whether sufficient evidence supports a jury's verdict in a criminal trial.  United States v. Maxwell, 579 F.3d 1282, 1299 (11th Cir. 2009).  However, we review arguments not raised before the district court only for plain error.  United States v. Hunerlach, 197 F.3d 1059, 1068 (11th Cir. 1999).  Specifically as to sufficiency-of-the-evidence arguments, we have applied plain-error review even when a defendant moved for a judgment of acquittal on sufficiency-of-the-evidence grounds but failed to articulate at that time the specific sufficiency-of-the-evidence claim later raised on appeal.  Id. at 1064, 1068-69.  Under plain-error review, a defendant must show (1) error (2) that is plain and (3) that affected her substantial rights.  United States v. Turner, 474 F.3d 1265, 1276 (11th Cir. 2007).  Even if the defendant meets these three conditions, we may exercise our discretion to reverse only if "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings."  Id. (quotation omitted).

In reviewing the sufficiency of the evidence, we take the evidence in the light most favorable to the government, resolve any conflicts in favor of the government, and draw all reasonable inferences that tend to support the government's case. Maxwell, 579 F.3d at 1299. "Evidence is sufficient to support a conviction if a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt." Id. (quotation omitted). The defendant, in rebutting the government's evidence, may not simply put forth a reasonable hypothesis of innocence, as the issue is not whether a jury reasonably could have acquitted but whether it reasonably could not have found guilt beyond a reasonable doubt. Id.

## B. Unauthorized Access Devices

Count One charges a violation of 18 U.S.C. § 1029(a)(3), possessing 15 or more unauthorized access devices. Section 1029(a)(3) prohibits possessing, "knowingly and with intent to defraud[,] . . . fifteen or more devices which are counterfeit or unauthorized access devices . . . if the offense affects interstate or foreign commerce." The statute defines "unauthorized access device" as "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." 18 U.S.C. § 1029(e)(3). Counts Two through Six charge a violation of 18 U.S.C. § 1028A(a)(1), aggravated identity theft. Section 1028A provides that "[w]hoever, during and in relation to," inter alia, the felony of

32

possessing 15 or more unauthorized access devices, "knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."  18 U.S.C. § 1028A(a)(1), (c)(4).

On appeal, Handy does not dispute that social security numbers qualify as access devices or that her offense affected interstate commerce.[12]  Handy has not shown error, let alone plain error, in the denial of her motion for judgment of acquittal.  Handy argues that the evidence was insufficient to support her convictions under § 1029(a)(3) and § 1028A(a)(1) because the evidence did not establish that her possession of the social security numbers was unauthorized or that she used the social security numbers to file unauthorized tax returns.

As to Handy's § 1029(a)(3) conviction in Count One, viewing the evidence in the light most favorable to the government, we conclude that the evidence showed, at the very least, that Handy possessed 17 social security numbers that were obtained with the intent to defraud.  See 18 U.S.C. § 1029(e)(3).  Specifically, one of the notebooks in Handy's backpack contained the social security numbers and other personal identifying information of 17 incarcerated individuals, and a reasonable jury could infer from the evidence we have recounted above, including the testimony of Crystal Lambert, that Handy possessed these

_____

[12]Section 1029 defines "access device" as, in relevant part, any "personal identification number."  18 U.S.C. § 1029(e)(1).

33

social security numbers and other information without authorization and with the fraudulent intent to illegally obtain income tax refunds.

As to Handy's § 1028A(a)(1) convictions in Counts Two through Six, this evidence likewise was sufficient for a reasonable jury to infer that Handy used each of the social security numbers charged in Counts Two through Six to file false income tax returns.  See 18 U.S.C. § 1028A(a)(1).  Finally, the jury could reasonably conclude, based on Lambert's testimony and the associated prisoner identification numbers, that these social security numbers belonged to other persons.

## VI.  404(B) EVIDENCE

Defendant Handy contends that the district court plainly erred in admitting evidence of other crimes found in the Impala, specifically, the credit cards in Willie Donnell's name and testimony by Donnell that she had not applied for the cards or authorized Handy to possess them.[13]

Federal Rule of Evidence 404(b) provides:

Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character. . . . This evidence may be admissible for another purpose, such as proving motive,

---

[13]We decline to consider Handy's additional argument that the district court plainly erred in failing to sua sponte give a Federal Rule of Evidence 404(b) limiting instruction because Handy waived any right to a limiting instruction by affirmatively stating during the charge conference that she had no objection to the district court's suggestion not to give a Rule 404(b) instruction.  See United States v. Fulford, 267 F.3d 1241, 1247 (11th Cir. 2001).

34

opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. . . .

Fed. R. Evid. 404(b). We use a three-part test to determine whether other bad acts are admissible under Rule 404(b): (1) "the evidence must be relevant to an issue other than the defendant's character"; (2) "the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act"; and (3) "the probative value of the evidence must not be substantially outweighed by its undue prejudice." United States v. McNair, 605 F.3d 1152, 1203 (11th Cir. 2010) (quotation omitted).

However, evidence of criminal activity other than the charged offense is not extrinsic under Rule 404(b) if (1) the uncharged offense arose out of the same transaction or series of transactions as the charged offense, (2) the evidence is necessary to complete the story of the crime, or (3) the evidence is inextricably intertwined with the evidence regarding the charged offense. United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998).

We conclude that the district court did not plainly err in admitting the evidence at issue here because the evidence was not extrinsic under Rule 404(b) but rather was inextricably intertwined with the evidence of the charged offenses. Even if the evidence was extrinsic and within the scope of Rule 404(b), we would conclude that the evidence nonetheless was admissible. First, the evidence was relevant to show Handy's knowing possession of the items in the Impala and her

35

fraudulent intent.  Second, we are not persuaded by Handy's argument that there was insufficient proof that she knowingly possessed the credit cards in Donnell's name, as the cards were found in Handy's rental car intermingled with items bearing Handy's name.  Finally, we conclude that the evidence's probative value substantially outweighed any undue prejudice.

## VII.  SUBSTITUTION OF COUNSEL

Defendant Handy further argues on appeal that the district court should have granted her motion for appointment of substitute counsel because the record demonstrates a complete breakdown in communication between herself and Assistant Federal Public Defender Doakes in the weeks leading up to trial.

We review for an abuse of discretion the district court's denial of a motion for new counsel, considering: "1) the timeliness of the motion; 2) the adequacy of the court's inquiry into [the] merits of the motion; and 3) whether the conflict was so great that it resulted in a total lack of communication between the defendant and [her] counsel thereby preventing an adequate defense."  United States v. Calderon, 127 F.3d 1314, 1343 (11th Cir. 1997).

Although a defendant has a right to counsel, she does not have the unqualified right to the appointed counsel of her choice.  United States v. Garey, 540 F.3d 1253, 1263 (11th Cir. 2008) (en banc).  Accordingly, an indigent defendant has no right "to demand a different appointed lawyer except for good

cause." Id. (quotation omitted).  Good cause for substitution of counsel exists where there is "a fundamental problem, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict." Id. (quotation omitted).  Because good cause for substitution of counsel cannot be solely based on a defendant's perception, a defendant's general loss of confidence or trust in his counsel, standing alone, is not sufficient.  Thomas v. Wainwright, 767 F.2d 738, 742 (11th Cir. 1985).

Here, we find no abuse of discretion in the district court's denial of Handy's motion for substitution of counsel.  As an initial matter, with regard to the timeliness of the motion, Handy filed the motion a week before the scheduled trial and after she already had received a two-month continuance to retain private counsel.  Cf. Calderon, 127 F.3d at 1343.  Moreover, the district court held a hearing on the motion in which it conducted a thorough inquiry into the merits of Handy's motion, and Handy was permitted to speak at length concerning the alleged disagreements between herself and attorney Doakes.  See id.  Finally, we agree with the district court that any disagreement between Handy and attorney Doakes did not rise to the level of good cause for substitution of appointed counsel.  See Garey, 540 F.3d at 1263; Calderon, 127 F.3d at 1343.  In particular, we defer to the district court's findings that Handy's allegations concerning attorney Doakes were not credible, that any breakdown in communication stemmed from Handy's

37

refusal to cooperate with Doakes, and that Handy simply was trying to delay the trial.

## VIII.  SENTENCING ISSUES

### A.    Number of Victims

Relying on United States v. Hall, 704 F.3d 1317 (11th Cir. 2013), defendant Handy argues that the district court plainly erred in applying a four-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B) based on a finding that the offense involved between 50 and 250 victims because the government's evidence showed only that 17 of the social security numbers found in her possession were actually used.

We review objections to sentencing calculation issues raised for the first time on appeal for plain error.  United States v. Bennett, 472 F.3d 825, 831 (11th Cir. 2006).  "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."  United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003).  Moreover, in plain-error review, unlike in harmless-error review, "the defendant bears the burden of persuasion with respect to prejudice or the effect on substantial rights."  United States v. Monroe, 353 F.3d 1346, 1352 (11th Cir. 2003).  "A substantial right is affected if the appealing party can show that there is

a reasonable probability that there would have been a different result had there

been no error." Bennett, 472 F.3d at 831-32.

Section 2B1.1(b)(2) calls for a two-level increase to a defendant's base

offense level if her offense involved ten or more victims, but calls for a four-level

increase if her offense involved more than 50, but fewer than 250, victims.

U.S.S.G. § 2B1.1(b)(2)(A), (B). In cases such as this, involving "means of

identification,"[14] the relevant Guidelines commentary defines a "victim" as

including "any individual whose means of identification was used unlawfully or

without authority." U.S.S.G. § 2B1.1 cmt. n.4(E).

In Hall, we held, as a matter of first impression, that the mere transfer of

unauthorized identifying information is not equivalent to the actual use of the

identifying information for enhancement purposes based on the number of victims

under § 2B1.1(b)(2). 704 F.3d at 1323. In Hall, the defendant, an office assistant

in a doctor's office, provided her co-conspirators with the personal identifying

information of 141 patients via text messages, receiving $200 in compensation. Id.

at 1319. In turn, the defendant's co-conspirators used at least 12 of the patients'

personal identifying information to obtain fraudulent credit cards. Id. At

sentencing, over the defendant's objection, the district court applied the four-level

---

[14]"Means of identification" has the meaning given by 18 U.S.C. § 1028(d)(7), see U.S.S.G. § 2B1.1 cmt. n.1, and includes "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any . . . name, social security number, date of birth, [or] official State or government issued driver's license or identification number," 18 U.S.C. § 1028(d)(7).

enhancement under § 2B1.1(b)(2)(B) under the theory that the intentional transfer of all 141 patients' information in exchange for consideration constituted actual use pursuant to that provision. Id. at 1320.

On appeal, we disagreed, concluding that "the guideline, its commentary, and application notes indicate that the mere transfer of unauthorized identifying information is not the equivalent to the actual use of the identifying information for a fraudulent purpose." Id. at 1323. We noted the differing plain meanings of the words "use" and "transfer," and observed that the Sentencing Commission elsewhere in § 2B1.1 employed the phrase "transfer or use," suggesting that the Commission intended "transfer" and "use" each to have a particular, nonsuperfluous meaning. Id. at 1321-22. Because "the plain language of the sentencing guideline at issue [did] not apply to [the defendant's] mere sale or transfer of the patients' identifying information," the appropriate enhancement was a two-level increase under § 2B1.1(b)(2)(A) for ten or more victims because "the purpose of the conspiracy was realized when the conspirators used the 12 patients' identifying information to obtain the fraudulent credit cards." Id. at 1323.

In this case, we cannot say that the district court committed plain error in applying the four-level enhancement under § 2B1.1(b)(2)(B) for more than 50 victims to Handy's base offense level. The PSI stated that 73 social security numbers were found in Handy's possession and that, although the government's

40

investigation was ongoing, "the identifiers were fraudulently used in various schemes." Handy failed to object to this factual statement in the PSI, and thus, she is deemed to have admitted it. See Bennett, 472 F.3d at 833-34; United States v. Beckles, 565 F.3d 832, 844 (11th Cir. 2009) (holding that a "defendant's failure to object to conclusory statements in the PSI renders those statements undisputed and permits the sentencing court to rely upon them without error even if there is an absence of supporting evidence"). To the extent that the 73 individuals' social security numbers were "used" in fraudulent schemes, the individuals clearly qualified as "victims" for purposes of § 2B1.1(b)(2). See U.S.S.G. § 2B1.1 cmt. n.4(E).

## B.    The $7,000 Fine

Defendant Handy's final argument on appeal is that the district court clearly erred in imposing a $7,000 fine because the court did not consider the factors provided in U.S.S.G. § 5E1.2(d) in setting the amount of the fine and instead based the fine merely on Handy's refusal to cooperate with the probation officer.

We review the district court's imposition of a fine for clear error. United States v. Long, 122 F.3d 1360, 1366 (11th Cir. 1997). The Sentencing Guidelines provide that the district court "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). Thus, the burden is on the defendant to prove

her inability to pay a fine.  McNair, 605 F.3d at 1232.  If a defendant establishes

that she is unable to pay a fine, the district court may waive the fine or impose a

lesser fine.  U.S.S.G. § 5E1.2(e).

Once a district court decides that a fine is appropriate, it must consider the

following factors in determining the amount of the fine:

(1)  the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;

(2)  any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of [her] earning capacity and financial resources;

(3)  the burden that the fine places on the defendant and [her] dependents relative to alternative punishments;

(4)  any restitution or reparation that the defendant has made or is obligated to make;

(5)  any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;

(6)  whether the defendant previously has been fined for a similar offense;

(7)  the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and

(8)  any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).

42

We do not require a district court to make specific findings for each factor as long as the record reflects the district court's consideration of the pertinent factors prior to imposing the fine. McNair, 605 F.3d at 1233. Ultimately, the record must contain sufficient information with respect to the factors to permit a reviewing court to conclude that the district court did not clearly err in imposing or setting the amount of the fine. United States v. Khawaja, 118 F.3d 1454, 1459 (11th Cir. 1997). If the PSI presented information with respect to the factors, and the district court reviewed the PSI before imposing the fine, we "infer without hesitation" that the district court considered the pertinent factors before imposing the fine. Id.

We conclude that the district court did not clearly err in imposing the $7,000 fine.[15] As to whether she was able to pay a fine, Handy does not dispute that she never signed any financial release forms. Moreover, at sentencing, Handy still failed to present any evidence concerning her finances to show her inability to pay a fine. See McNair, 605 F.3d at 1232. Indeed, according to her own statements reported in the PSI, Handy had the earning potential of between $70,000 to $100,000 per year based on her average annual income since 2009, suggesting her ability to pay a fine.

---

[15]Because we find no error, plain or otherwise, we do not address the government's contention that plain-error review applies despite Handy's own objection following the district court's imposition of sentence.

As to the amount of the fine, the record clearly contains sufficient information to reflect the district court's consideration of the pertinent § 5E1.2(d) factors prior to setting the fine.  See McNair, 605 F.3d at 1233.  On appeal, Handy argues that the district court relied primarily on Handy's refusal to cooperate with the probation officer in setting the fine.  The record, however, demonstrates that the district court either specifically discussed or considered (through its review of the PSI) the pertinent § 5E1.2(d) factors.  See Khawaja, 118 F.3d at 1459.  Indeed, the PSI, which the district court reviewed and adopted, reported facts relevant to the § 5E1.2(d) factors, including that Handy had no dependents, that she owned a business, and that she had earned annual incomes reaching six figures in the decade prior to sentencing.  In addition, in imposing Handy's sentence, which included the fine, the district court explicitly addressed the seriousness of the offenses and the need to provide adequate deterrence to Handy.  See U.S.S.G. § 5E1.2(d)(1).  The district court also discussed Handy's ability to pay the fine in light of her earning capacity and financial resources, setting the fine at ten percent of the low end of her average annual income since 2009.  See U.S.S.G. § 5E1.2(d)(2).

## IX.  CONCLUSION

For the foregoing reasons, we affirm Handy's convictions and sentences.

**AFFIRMED.**